UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRIAN J. LYNGAAS, D.D.S., P.L.L.C.,

Plaintiff,

Case No. 22-cv-10830
v. Honorable Linda V. Parker

SOLSTICE BENEFITS, INC.,

Defendant.
_______________________________/

**OPINION AND ORDER GRANTING DEFENDANT'S SUMMARY JUDGMENT MOTION AND DENYING PLAINTIFF'S SUMMARY JUDGMENT MOTION**

This is a putative class action lawsuit filed under the Telephone Consumer Protection Act ("TCPA"). The action arises from a single, one-page fax sent on behalf of Defendant Solstice Benefits, Inc. ("Solstice") to dental providers, including Plaintiff Brian J. Lyngaas, D.D.S., P.L.L.C. ("Plaintiff"), on or about April 23, 2018. The matter is presently before the Court on the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), which are fully briefed. For the reasons set forth below, the Court finds no genuine dispute of any material fact and that Defendant is entitled to summary judgment as a matter of law. Therefore, the Court grants Defendant's motion and denies Plaintiff's motion.

## I. Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248). The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

When the parties file cross-motions for summary judgment, the standard does not change. *Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 387 (6th Cir. 2016) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts." *Id*. (quoting *Taft Broad.*, 929 F.2d at 248). "[T]he court must

evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id*.

# I. Factual Background

## A. The Parties

Plaintiff is a dental practice in Livonia, Michigan, owned by Brian J. Lyngaas, D.D.S. (ECF No. 116-10 at PageID.5017; ECF No. 146-2 at PageID.21459.) Solstice is a licensed insurance company which provides dental and vision benefits to groups, employers, and individuals throughout the United States. (ECF No. 140-1 at PageID19500-01 ¶ 3; ECF No. 146-1 at PageID.21404-05 ¶ 3.)

## B. Solstice's Relevant Plans, Provider Network & Network Lease Arrangements

Solstice maintains a provider network comprised of dentists and dental practices that participate in Solstice networks and agree to accept members on associated plans, referred to as "in network" dentists or providers. (ECF No. 140-1 at PageID.19501 ¶ 4.) In-network dentists or providers agree to a schedule of procedure costs. (ECF No. 146-1 at PageID.21405 ¶ 4.) By using in-network providers, plan members obtain benefits at lower rates. (*Id*. at ¶ 5.) Solstice does not charge providers to join or sign up on a Solstice provider network. (*Id*. at PageID.21406 ¶ 8; ECF No. 146-2 at PageID.21489, 21701-02.)

Solstice offers several different dental benefit plans which utilize different aspects of Solstice's provider networks. (ECF No. 146-1 at PageID.21405 ¶ 5.) For example, some dental providers participate only on Solstice's preferred provider organization ("PPO") plans, while others are on only Solstice's dental health maintenance organization ("DHMO") plans, its "discount" plans, or other plans. (*Id.*) Many providers participate in multiple plans. (*Id.* ¶ 6.)

The providers in Solstice's network have either contracted with Solstice directly (referred to as "organic" providers), or they contracted with other dental insurance companies or dental provider networks with which Solstice has entered a Network Access Arrangement (or "network lease"). (ECF No. 140-1 at PageID.19502 ¶ 11.) Regardless of whether they are in-network providers as a result of a direct or indirect contract, Solstice manages its provider network, processes claims submissions (requests for payment by the provider for covered dental benefits), and makes participating providers known to plan members through provider directories and Solstice's website to enable plan members find in-network providers on the member's specific plan. (ECF No. 146-1 at PageID.21405 ¶ 7.)

Solstice's provider directories are available on its website. (ECF No. 140-1 at PageID.19501-02 ¶ 8.) The database includes "organic" providers and those providers who contracted with a dental insurance company or dental provider

network with which Solstice has entered a Network Access Agreement. (*Id.* at PageID.19502 ¶ 11.) The database contains the information Solstice uses to communicate with in-network providers, including their telephone fax numbers. (*Id*. ¶ 10.)

Providers within Solstice's network as a result of the provider's contract with another dental insurance company agreed in those contracts to participate in plans and networks offered by other dental insurance companies that have entered into network leases with their insurers or networks. (ECF No. 140-1 at PageID.19502 ¶ 11.) As relevant here, Solstice has entered network leases with United Concordia Companies, Inc. ("UCCI"). (*Id*. at ¶ 12; ECF No 143.)

Solstice and UCCI entered a "Network Access Agreement" (or network lease), on July 1, 2016. (ECF No. 146-1 at PageID.21406 ¶ 10; *see also* ECF No. 144-2.) Pursuant to this network lease, UCCI granted Solstice access to the providers on its United Concordia Advantage Plus Dental network for use in Solstice's PPO dental benefit plans. (ECF No. 146-1 at PageID.21406 ¶ 11; ECF No. 144-2 §§ 1.3, 1.12, 2.4, 3.3.) Thus, participants in Solstice's PPO dental benefit plans have access on an in-network basis to providers that contract directly with UCCI. (ECF No. 146-1 at PageID.21406 ¶ 12.)

### C. Plaintiff's Agreement with UCCI

Plaintiff has been a participating provider on several plans with UCCI since Plaintiff's office was formed in 2012. (ECF No. 116-10 at PageID.5003.) Earlier, on December 3, 2009, Dr. Lyngaas signed a Participating Dentist Agreement ("PDA") with UCCI, pursuant to which he became a participating provider in the UCCI Advantage Plus Dental Network.[1] (ECF No. 146-8; *see also* ECF No. 146-9 (legible but unsigned version); ECF No. 146-2 at PageID.21444; ECF No. 144-2 §§ 1.3, 1.12, 2.4, 3.3.) The PDA provides that "the Dentist agrees to accept communications from [UCCI] via mail, facsimile, or email at the addresses/numbers shown on Dentist's Credentialing Application." (ECF No. 146-9 ¶ 1d; ECF No. 140-8 at PageID.20247.) The PDA further provides

> Dentists agrees to participate at all practice locations with all [UCCI] Fee for Service Programs and in any other plan, program, or arrangement for which [UCCI] has agreed to provide access to the Network ("Network Access Arrangements"). Dentist specifically authorizes [UCCI] to enter into Network Access Arrangements and agrees to provide services to Members enrolled under Network Access Arrangement, *subject to all of the terms and conditions of this Agreement*.

(*Id.* ¶ 2 (emphasis added).) The PDA provides that a list of all currently effective network leases are listed on UCCI's website. (*Id.*)

---

[1] While Plaintiff takes care in stating that this agreement was entered into by Dr. Lyngaas individually, Plaintiff acknowledges Dr. Lyngaas's deposition testimony that Plaintiff has been a participating provider on several UCCI plans since 2012. (ECF No. 187 at PageID.32210 (citing ECF No. 116-10 at PageID.5003).)

Pursuant to the PDA and UCCI's Network Access Agreement with Solstice, UCCI included Plaintiff's information, including its fax number, in the provider directory transmission to Solstice. (ECF No. 146-1 at PageID.21407-09 ¶¶ 14-16, 24; ECF No. 144-2 § 2.2.1.) Plaintiff has been in Solstice's provider directory as a participating provider on the Solstice PPO plan since at least 2017. (ECF No. 146-1 at PageID.21407 ¶ 15.) UCCI notified its network providers, including Plaintiff, of its agreement with Solstice in December 2016. (ECF No. 184-2.)

**D. Events Leading Up To & The Subject Fax**

Starting in September 2017, a new customer group (NAFMD) started to enroll its more than 25,000 members into various Solstice plans, including its PPO. (ECF No. 146-1 at PageID.21409 ¶¶ 25-26.) By March 2018, when some of the new Solstice plan members visited in-network providers, they were incorrectly told by the dental practice that it was not a Solstice provider or was but did not take the specific plan. (*Id.* at PageID.21410 ¶ 27; *see also* ECF No. 144-3 to 144-6.)

In a March 26, 2018 email, Solstice's Provider Relations Manager, Sherri Irwin, reported this issue to other Solstice employees and proposed sending "a blast fax introducing the group and what plans they offer their members." (ECF No. 144-3 at PageID.21264.) On the same date, Brian Correia, Director of Sales and Client Services at Solstice, who was a recipient of Irwin's email, sent an email to Stacey Brocatto, Vice President of Provider Relations at Solstice, and Carlos

Ferrera, Solstice's Chief Operating Officer, sharing that NAFMD was slowing its move of over 20,000 discount members due to NAFMD's concern "because we are having some issues with Providers not knowing who Solstice is . . .." (*Id.* at PageID21260.) Ferrera responded, in part: "Should we do some marketing to our 'new' existing providers, and show [NAFMD] that we're doing something?" (*Id.*)

Consistent with Irwin's recommendation, Solstice decided to prepare a "new group" communication to the network providers. A new group communication is a routine communication used by insurers as groups regularly change their insurance coverage. (ECF No. 146-1 at PageID.21410 ¶ 29.) The communication is sent to the insurance company's in-network/participating providers to facilitate them providing dental benefits to new plan members, to ensure a smooth transition, and so providers can retain patients by informing them they are in-network on the patient's new plan. (*Id.*) These new group communications usually identify the new group, the insurance carrier's benefit plan or plans the group members may be on, how to verify a patient's eligibility to receive benefits under the plan from the provider (i.e., confirming the provider is in-network on their plan), and how the provider can submit a claim for payment from the carrier. (*Id.* ¶ 30.)

The new group communication was prepared and distributed by Solstice's Provider Relations Department, which handles communications with network providers, under the direction and upon review by Brocatto. (*Id.* at PageID.21411

¶¶ 31, 34.) Solstice's Marketing Department and Sales Department were not involved in any way. (*Id.*) Brocatto provides that "[n]o one at Solstice considered using this communication to solicit or offer to sell anything to, or make a profit from, the already existing, in-network providers who would be receiving it or from plan members (who already had Solstice plans)." (*Id.* ¶ 34.) In fact, Solstice has never sold or taken money from any participating provider for any product or service. (*Id.* ¶ 36.)

The communication was sent by mail and email to various dental practices, in particular large dental service organizations ("DSOs"), which contract to manage and administer a large number of offices. (ECF No. 146-1 at PageID.21412 ¶ 33.) "To better alleviate some of the confusion being experienced by the NAFMD group and so that more than just the DSOs were informed, the Provider Relations Department decided to communicate the same letter by fax to all Solstice in-network providers on any of the four Solstice plans made available to the NAFMD group members." (*Id.* ¶ 40.) The "target list" was taken from Solstice's database entries of existing in-network providers who participated on at least one of those four Solstice plans. (*Id.* ¶ 41.) As Plaintiff is on the Solstice PPO network, it was included. The letter indicated that the recipient "may be a contracted provider for one or all plans," not because any recipient was not already

a Solstice in-network provider, but because they may have participated in one, two, three, or maybe even all four plans. (*Id.* at PageID.21412-13 ¶¶ 43, 46.)

Solstice's Director of Information Technology, Daniel Paz, researched various faxing options and ultimately suggested WestFax, Inc. to transmit the new group communication. (ECF No. 146-15 at PageID.22255-56.) Paz reformatted the communication to fit on one page and, at WestFax's suggestion, added language at the bottom of the page, which was obtained from a website WestFax directed him to, informing recipients they could call a toll-free number run by WestFax or send a fax to a Solstice fax number to opt out of any future faxes. (ECF No. 144-11.)

Attached as "Appendix A" is the one-page fax WestFax sent on Solstice's behalf, which Plaintiff received and triggered this litigation.

## II. Applicable Law & Analysis

Plaintiff's Complaint contains a single count alleging a violation of the TCPA's prohibition against sending an unsolicited advertisement to a telephone facsimile machine, 47 U.S.C. § 227(b)(1)(C). (*See* ECF No. 1 at PageID.13.)

Section 227(b)(1)(C) makes it unlawful to fax an unsolicited advertisement unless—

> i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

> (ii) the sender obtained the number of the telephone facsimile machine through—
>
> (I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or
>
> (II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,
>
> except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before July 9, 2005; and
>
> (iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),
>
> except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E);

47 U.S.C. § 227(b)(1)(C). The issues raised by the parties' summary judgment motions are whether the fax Solstice sent to Plaintiff was an "advertisement," whether it was "unsolicited," and if it was an unsolicited advertisement, whether the statute's established-business-relationship exception applies. The Court's analysis begins and ends with the first issue.

Whether a fax is an advertisement is a legal question which the court resolves if there are no genuine issues of material fact. *See Matthew N. Fulton,*

*D.D.S., P.C. v. Enclarity, Inc.*, 962 F.3d 882, 890 (6th Cir. 2020) (citing *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 221 (6th Cir. 2015)) ("Whether a fax constitutes an unsolicited advertisement is a question of law."). An "unsolicited advertisement" is "any material advertising the commercial availability or quality of any property, goods, or services, which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id*. § 227(a)(5).

Interpreting this language, the Sixth Circuit has found that the statute does not bar the unsolicited sending of a fax that is not "*commercial* in nature." *Sandusky*, 788 F.3d at 222; *see also Matthew N. Fulton*, 962 F.3d at 891. "Commercial," the Sixth Circuit provided in *Sandusky*, "means of, in, or relating to commerce; from the point of view of profit; having profit as the primary aim. It's something that relates to buying and selling. So to be an ad, the fax must promote goods or services to be bought or sold, and it should have profit as an aim. " *Id.* (internal quotation marks and citations omitted). But "the sender's profit motive must be sufficiently direct." *Brian J. Lyngaas, D.D.S., P.L.L.C. v. United Concordia Companies, Inc.*, 140 F.4th 749, 751 (6th Cir. 2025). "The fact that the sender might gain an ancillary, remote, and hypothetical economic benefit later on does not convert a noncommercial, informational communication into a commercial solicitation." *Id.* (quoting *Sandusky*, 788 F.3d at 225).

Plaintiff argues that the Sixth Circuit's decision in *Lyngaas* controls the outcome here and leads to the conclusion that the fax from Solstice was an advertisement. The Court disagrees, finding the fax there distinguishable.

*Lyngaas* arose from Plaintiff's contract with UCCI pursuant to which dental practices in one of UCCI's networks, which included Plaintiff, received discounts from third-party vendors under what was referred to as a Value Add Program ("VAP").[2] 749 F.4th at 750. "UCCI negotiated exclusive deals with these vendors in exchange for promotion of the vendors' products, and UCCI memorialized the deals in 'marketing' and 'strategic' agreements." *Id.* Plaintiff sued UCCI under the TCPA after it sent three faxes which, "respectively, provided information on (1) discounts on personal protective equipment by Prophy Magic; (2) discounts on dentist-specific recycling buckets provided by Dental Recycling North America; and (3) promotional services for student loan refinancing by GradFin." *Id.*

The Sixth Circuit concluded that these faxes were advertisements under the statute because they "facially promoted direct sales by [UCCI's] third-party partners and its profit motive was sufficiently direct because it sent the promotions as part of negotiated marketing agreements." *Id.* at 751. The court found that "the only proffered explanation for this bargain is that UCCI sought to maintain and

[2] The Court uses "Plaintiff" because the party that brought the lawsuit there is the same dental practice that brought the present action.

grow its provider network, which would in turn help grow its customer base." *Id.* at 752. "The third-party partners received highly effective marketing" and "UCCI sent the faxes as consideration for receiving economic value, in the form of exclusive discounts from the vendors." *Id.* at 752-53. Moreover, "UCCI . . . provided no profit-neutral explanation for its own contracted benefit." *Id.*

In reaching this conclusion, the Sixth Circuit distinguished the faxes from those addressed in *Sandusky*. *See id.* at 752-53. The defendant in *Sandusky* was a pharmacy benefit manager, which acted as an intermediary between sponsors of health insurance plans and prescription drug companies. 788 F.3d at 220. The plaintiff was a healthcare provider. *Id.* As part of its services, the defendant produced a "formulary," which listed medications covered by a particular health insurance plan. *Id.* The defendant sent that formulary to its clients to aid in choosing healthcare plans, and also via fax to healthcare providers who prescribed the medication to the defendant's clients' employees. *Id.* The purpose of the fax was to "inform[] [the plaintiff] which drugs its patients might prefer, irrespective of [the defendant's] financial considerations." *Id.* at 221.

The Sixth Circuit held that the faxes were not advertisements under the TCPA. *Id.* at 222. The court reasoned:

> They call items (medications) and services (Medco's formulary) to Sandusky's attention, yes. But no record evidence shows that they do so because the drugs or Medco's services are for sale by Medco, now or in the

> future. In fact, the record evidence shows that Medco has no interest whatsoever in soliciting business from Sandusky. . . . And no record evidence shows that the faxes promote the drugs or services in a commercial sense—they're not sent with hopes to make profit, directly or indirectly, from Sandusky or the others similarly situated. . . . Nor does any record evidence show that Medco hopes to attract clients or customers by sending the faxes. The record instead shows that the faxes list the drugs in a purely information, non-pecuniary sense: to inform Sandusky what drugs its patients might prefer, based on Medco's formulary—a paid service already rendered not to Sandusky but to Medco's clients.

*Id.* at 222. These factual considerations, which rendered the fax in *Lyngaas* distinguishable, are not distinguishable here. In fact, what the record showed in *Sandusky*, the record shows here.

Yes, Solstice's fax called its dental insurance coverage (services) of certain insured individuals to the attention of Solstice's in-network dental providers, like Plaintiff. But the record does not suggest that Solstice did so to sell any service or product to those providers at the time or in the future. In fact, the record establishes that Solstice has never sold or promoted anything to its in-network providers. Providers do not pay anything to participate in a Solstice plan and therefore be in-network providers. Solstice sells its dental and vision insurance benefits to groups, employers, and individuals. Instead, the undisputed evidence establishes that the fax was sent purely to alert Solstice's in-network dental providers that members of NAFMD may be choosing one of the Solstice's plans

for which they may be a contracted provider, inform them of how to verify the patient's eligibility, and explain how to submit claim forms.

Plaintiff argues that the fax was commercial in nature, clinging to Ferrera's statement in an email that Solstice should "do some *marketing* to our 'new' existing providers" to convince NAFMD it was "doing something" to make sure its members' insurance benefits were recognized by in-network providers. Plaintiff maintains that, by sending the fax, "Solstice stood to profit by retaining existing plan members, promoting provider participation in its network, and discouraging dentists from opting out of servicing Solstice members, because provider participation was necessary to retain insured members and protect Solstice's revenue stream" (ECF No. 198 at PageID.33310.) Plaintiff also maintains that Solstice had an incentive "to convert dentists" "to expand its organic provider network" as it paid UCCI on a per-transaction basis for access to leased providers. (*Id.* at PageID.33314.) Putting aside whether these consequences are an even likely result of the fax,[3] they are far too remote to render it commercial in nature.

[3] For instance, the recipients of the fax already were Solstice's in-network providers, so it is unclear how it promoted provider participation in the network. For the same reason, having agreed to provide services under Solstice's plans, the provider could not "opt out" of serving NAFMD's members who are in the plan. Nothing in the fax encouraged or even suggested to the recipients that they should contract directly with Solstice.

As the Sixth Circuit said in *Sandusky*: "The fact that the sender might gain an ancillary, remote, and hypothetical economic benefit later on does not convert a noncommercial, informational communication into a commercial solicitation." 788 F.3d at 225. A contrary conclusion "would transform practically *all* communications from any entity that is financially motivated and exchanges good[s] or services for money into telemarketing or advertising[.]" *Smith v. Blue Shield of Cal. Life & Health Ins. Co.*, 228 F. Supp. 3d 1056, 1068 (C.D. Cal. 2017). It would create a minefield for businesses attempting to communicate with customers for routine purposes.

To illustrate, doesn't every fax from an insurance company to providers facilitating the provision of services to members have the effect of retaining existing members and promoting participation in the plan? If an insurance company sends a fax to participating providers announcing a revised portal to submit claims for reimbursement, does this not help the insurance company retain its members by making sure their services are covered? And if the revised portal is designed to make it easier for providers to submit claims, would this not also promote provider participation in the network?

For these reasons, whether viewed in a light most favorable to Plaintiff or Defendant, the Court finds no genuine issue of material fact with respect to whether the fax is an advertisement as defined by the TCPA, and concludes that it

is not.[4] Having reached this conclusion, the Court finds it unnecessary to address whether the fax was unsolicited or whether the established-business relationship exception applies.

## III. Conclusion

Having found that Solstice's fax to Plaintiff was not an advertisement, the Court concludes that the TCPA is inapplicable. Therefore, Solstice is entitled to summary judgment with respect to Plaintiff's TCPA claim.

Accordingly,

**IT IS ORDERED** that Solstice's motion for summary judgment is **GRANTED**.

---

[4] The boilerplate language added to the bottom of the new group communication fax regarding the right to opt out of "any *future* advertisement," which was inserted at WestFax's suggestion, does not transform the communication itself into an advertisement. Nor does the inclusion of Solstice's website at the bottom of the communication, simply because Solstice might offer products and services there. *See Mauthe v. Nat'l Imaging Assoc., Inc.*, 767 F. App'x 246, 250 (3d Cir. 2019) (rejecting the plaintiff's contention that a fax was an advertisement because it contained the defendant's website, reasoning that, "[b]y Mauthe's theory, any fax sent by defendant, for any purpose, as long as it contains defendant's website address, could become a 'pretext' to more advertising. We will not adopt a standard under the TCPA which effectively would construe inclusion of a website address in a fax as de facto advertising"). Here, Solstice's website was listed along with its address and phone number. Recipients were not directed to the website; instead, they were directed to Solstice's separate provider portal, Mysolstice.net, which is where providers that are already part of the Solstice network verify a patient's eligibility under a particular Solstice plan before providing any plan benefits.

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 28, 2026

# APPENDIX A

04-23-2018 13:51 9543995651 1/1

Solstice

April 2018

RE: Solstice Welcomes The National Association for Medical and Dental, Inc/Healthcare National Marketing, Incl

Dear Doctor,

Solstice is happy to announce that effective January 1, 2018***The National Association for Medical and Dental, Inc/Healthcare National Marketing, Inc.***has selected us as their carrier for theirdental PPO, DHMO, and Discount benefits administration. This group has over 25,000 members who will choose betweenone of the plans listed below:

- Solstice PPO
- DHMO-500B
- Discount Plan-Plus Plan One
- Discount Plan-Plus Plan Complete

**You may be a contracted provider for one or all plans.**

To verify eligibility, log into (or create an account)**Mysolstice.net** before providing any plan benefits.

Claims should be submitted to:

**Solstice**
**P.O. Box 14009**
**Lexington, KY 40512-4009**
**Payor ID: 76578**
**NEA: Solstice Benefits**

You can always call and verify eligibility information through ourInteractive Voice Response (IVR) system and request a faxed verification of eligibility thru our IVR by calling 877.760.2247.

Should you have any questions about this letter you may contact our Customer Service Department Monday thru Friday 8:00am to 6:00pm at 877.760.2247.You can also reach out to your local Solstice Provider Relations Representative or email ProviderRelations@SolsticeBenefits.com.

We look forward to continuing to promote your practice through our growing membership base!

Sincerely,

Your Dedicated Provider Relations Team

The recipient is entitled to request that the sender not send any future advertisements to its telephone facsimile machines. Failure to comply within 30 days from the date the request is properly made is unlawful. 866-632-3510 is the telephone number and 954-526-5853 is the fax number for the recipient to transfer such opt-out request.

P.O. Box 19199 * Plantation, FL 33318
877.760.2247
SolsticeBenefits.com