# EXHIBIT A

## Roy Taub

| | |
|---|---|
| **From:** | Roy Taub <Roy.Taub@gmlaw.com> |
| **Sent:** | Tuesday, August 23, 2022 6:05 PM |
| **To:** | Phil Bock; service@classlawyers.com; rshenkan@shenkanlaw.com |
| **Cc:** | Jeffrey Backman; Guinn, Kristen E.; Khia Joseph; Cheryl Cochran |
| **Subject:** | Lyngaas v. Solstice |
| **Attachments:** | Solstice's Motion for Rule 11 Sanctions.pdf |

Counsel,

In compliance with Fed. R. Civ. P. 11(c)(2), attached please find Solstice Benefits, Inc.'s Motion for Rule 11 Sanctions. Please advise when you will be available to meet and confer by telephone regarding the motion. We can also discuss the confidentiality order I have previously circulated and a motion for judgment on the pleadings that we intend to file.

GreenspoonMarder LLP 40
CELEBRATING FORTY YEARS TOGETHER

Roy Taub
Greenspoon Marder LLP
Partner
200 East Broward Boulevard, Suite 1800
Fort Lauderdale, FL 33301
Direct Phone Number: (954) 527-6231
Office Phone Number: (954) 491-1120
roy.taub@gmlaw.com
www.gmlaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| BRIAN J. LYNGAAS, D.D.S., P.L.L.C., individually and on behalf of all others similarly-situated,<br><br>Plaintiff,<br><br>v.<br><br>SOLSTICE BENEFITS, INC. and JOHN DOES 1-5,<br><br>Defendants. | Case No. 22-cv-10830<br><br>Hon. Linda V. Parker<br><br>Hon. Curtis Ivy, Jr.<br><br>**CLASS ACTION** |

**DEFENDANT SOLSTICE BENEFITS, INC.'S MOTION FOR RULE 11 SANCTIONS**

Defendant Solstice Benefits, Inc. ("Solstice") moves, pursuant to Federal Rule of Civil Procedure 11(b), for entry of an order imposing sanctions against Plaintiff Brian J. Lyngaas D.D.S., P.L.L.C., the law firms of Bock Hatch & Oppenheim, LLC and Shenkan Injury Lawyers, PLLC, and their attorneys, for the filing of the Complaint alleging violations of the federal Telephone Consumer Protection Act of 1991, as amended by the Junk Fax Prevention Act of 2005, 47 U.S.C. § 227 (hereinafter "TCPA"), in the amount of Solstice's attorneys' fees incurred in this action, including those incurred in connection with the instant Motion.

In accordance with Local Rule 7.1(a), on ________ __, 2022, counsel for

Solstice Defendant's counsel conferred with counsel for Plaintiff by telephone in which the nature of the motion and its legal basis was explained, but did not obtain Plaintiff's concurrence in the relief sought.

WHEREFORE, Defendant requests that this Court grant its Motion and enter an Order imposing sanctions against Plaintiff Brian J. Lyngaas D.D.S., P.L.L.C. and the law firms of Bock Hatch & Oppenheim, LLC and Shenkan Injury Lawyers, PLLC, and their attorneys.

Dated: August 23, 2022

GREENSPOON MARDER LLP

/s/ *Jeffrey A. Backman*
Jeffrey A. Backman
Roy Taub
200 East Broward Blvd., Suite 1800
Fort Lauderdale, Florida 33301
954.491.1120 (Telephone)
954.343.6958 (Facsimile)
jeffrey.backman@gmlaw.com
roy.taub@gmlaw.com

SMITH HAUGHEY RICE & ROEGGE, PC
Kristen E. Guinn P72148
100 Monroe Center NW
Grand Rapids, MI 49503
(616) 458-6245 (Telephone)
(616) 774-2461 (Facsimile)
kguinn@shrr.com

*Attorneys for Defendant*
*Solstice Benefits, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| BRIAN J. LYNGAAS, D.D.S., P.L.L.C., individually and on behalf of all others similarly-situated, | ) | Case No. 22-cv-10830 |
| Plaintiff, | ) | Hon. Linda V. Parker |
| v. | ) | Hon. Curtis Ivy, Jr. |
| SOLSTICE BENEFITS, INC. and JOHN DOES 1-5, | ) | **CLASS ACTION** |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANT SOLSTICE BENEFITS, INC.'S MOTION FOR RULE 11 SANCTIONS**

## STATEMENT OF THE ISSUES PRESENTED

1. Whether sanctions under Federal Rule of Civil Procedure 11 should be imposed for the filing of a frivolous complaint because the fax at issue was not an advertisement under the Telephone Consumer Protect Act.

2. Whether sanctions under Federal Rule of Civil Procedure 11 should be imposed for the filing of a frivolous complaint because the fax at issue was not unsolicited under the Telephone Consumer Protect Act.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

1. *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609 (6th Cir. 2010)

2. 47 U.S.C. § 227(a)(5)

3. 47 U.S.C. § 227(b)(1)(C)

4. *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218 (6th Cir. 2015)

5. *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362 (11th Cir. 2017)

## I. This Court Should Sanction Plaintiff, Plaintiff's Law Firms, Bock Hatch & Oppenheim, LLC and Shenkan Injury Lawyers, PLLC and Their Attorneys

This Court should sanction Plaintiff, Plaintiff's law firms, Bock Hatch & Oppenheim, LLC and Shenkan Injury Lawyers, PLLC, and their attorneys, because Plaintiff's Complaint is objectively frivolous, and the signing attorneys failed to make a reasonable inquiry. First, Plaintiff's Complaint is objectively frivolous because the fax sent by Solstice to the Plaintiff was not an advertisement. Second, Plaintiff's Complaint is objectively frivolous because the fax sent by Solstice was not unsolicited.

## II. Procedural Posture

On April 18, 2022, Plaintiff filed its Complaint in this Court against Solstice, asserting one count under the TCPA. *See* Ex. A ("Compl."). The Complaint, which seeks to certify a nationwide class, concerns a purported facsimile from almost exactly four years earlier, April 23, 2018, less than a week before the expiration of the four-year statute of limitations under the TCPA. *See* Compl. at ¶ 4 & Ex. A.

## III. Rule 11 Sanctions

"Under Federal Rule of Civil Procedure 11, sanctions may be imposed if 'a reasonable inquiry discloses the pleading, motion, or paper is (1) not well grounded in fact, (2) not warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose

such as harassment or delay.'" *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (quoting *Herron v. Jupiter Transp. Co.*, 858 F.2d 332, 335 (6th Cir. 1988)). "The purpose of sanctions is to deter the abuse of the legal process. As amended, the rule stresses the need for some pre-filing inquiry into both the facts and the law to satisfy the affirmative duty imposed." *Id.* (internal quotation omitted) (citing *Century Prods., Inc. v. Sutter*, 837 F.2d 247, 250 (6th Cir. 1988)). "[T]he goals of Rule 11 . . . are the deterrence and punishment of offenders and the compensation of their opponents for expenditure of time and resources responding to unreasonable pleadings or motions." *INVST Fin. Group, Inc. v. Chem-Nuclear Sys., Inc.*, 815 F.2d 391, 404 (6th Cir. 1987). "If a district court concludes that Rule 11 has been violated, the court has no discretion and must impose sanctions. However, in deciding the nature and extent of sanctions to impose, the district court is given wide discretion." *Id.* at 401.

"In the Sixth Circuit, the test for imposing Rule 11 sanctions is 'whether the individual's conduct was objectively reasonable under the circumstances.'" *King v. Whitmer*, 556 F. Supp. 3d 680, 698 (E.D. Mich. 2021) (Parker, J.) (quoting *Nieves v. City of Cleveland*, 153 F. App'x 349, 352 (6th Cir. 2005)). "To determine objective reasonableness, the court must ask 'whether the position advanced by a party was supported by a reasonable inquiry into the applicable law and relevant facts.'" *Id.* (quoting *Advo Sys., Inc. v. Walters*, 110 F.R.D. 426, 430 (E.D. Mich.

1986)). "Whether a 'reasonable inquiry' was conducted 'is judged by objective norms of what reasonable attorneys would have done.'" *Id.* (quoting *In re Big Rapids Mall Assoc.*, 98 F.3d 926, 930 (6th Cir. 1996)). "This objective standard is 'intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments.'" *Id.* (quoting Fed. R. Civ. P. 11, Advisory Comm. Notes (1993)). Moreover, "the reasonable inquiry under Rule 11 is not a one-time obligation. . . . [T]he plaintiff is impressed with a continuing responsibility to review and reevaluate his pleadings and where appropriate modify them to conform to Rule 11." *Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 374 (6th Cir. 1996) (quotation omitted).

## IV. The Fax Sent by Solstice is Not an Advertisement Because it Only Provides Information

The TCPA prohibits the use of a fax machine to send an unsolicited advertisement, subject to certain exceptions. *See* 47 U.S.C. § 227(b)(1)(C). The TCPA defines the term "advertisement" as "material advertising the commercial availability or quality of any property, goods, or services . . . ." *Id.* at § 227(a)(5). Thus, the Sixth Circuit held, "[a]n advertisement is any material that promotes the sale (typically to the public) of any property, goods, or services available to be bought or sold so some entity can profit." *Sandusky Wellness Ctr., LLC v. Medco Health Sols., Inc.*, 788 F.3d 218, 222 (6th Cir. 2015). *See also*, *e.g.*, *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362, 1366-67 (11th Cir.

2017) (explaining that to be subject to the TCPA, "the fax must draw attention to the 'commercial availability or quality' of … products to promote their sale.").

In *Sandusky*, the Sandusky Wellness Center alleged that two faxes sent by Medco Health Solutions were unsolicited advertisements. 788 F.3d at 221. The first fax "informed Sandusky that '[t]he health plans of many of …[its] patients have adopted' Medco's formulary." *Id.* at 220. The fax also asked Sandusky to "'consider prescribing plan-preferred drugs' to 'help lower medication costs for [Sandusky's] patients,'" listed some of the drugs, and "told Sandusky where it could find a complete list of the formulary." *Id.* The second fax "informed Sandusky that a certain respiratory drug brand was preferred over another brand, and that using the preferred brand could save patients money." *Id.* at 221. Medco moved for summary judgment, arguing that the faxes were not advertisements as a matter of law because their primary purpose was informational rather than promotional. *Id.* Not only did the district court agree with Medco's argument, but it found the suit to be "'frivolous litigation,'" and "warned Sandusky and others like it 'not to file similar fruitless litigation.'" *Id.* On Appeal, the Sixth Circuit affirmed the grant of summary judgment, holding that the faxes were not advertisements because the faxes "merely informed Sandusky which drugs its patients might prefer, irrespective of Medco's financial considerations." *Id.*

In *Florence*, a medical clinic brought a class action suit under the TCPA

against Arriva, a supplier of medical products, relating to order forms that Arriva faxed the clinic for completion so patients could obtain insurance reimbursement. *Id.* at 1364. The district court dismissed the complaint for failure to state a claim because it found that the faxes were not advertisements. *Id.* at 1365. On appeal, the Eleventh Circuit affirmed the district court's ruling and held that the faxes were not advertisements because the faxes did not "promote the sale" of Arriva products. *Id.* at 1367. The court explained, "[t]he faxes do not promote the sale of Arriva goods because . . . the fax only requests information to complete an order already made." *Id.*

In *Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129 (3d Cir. 2019), a medical practice sued over a form fax that it received from a company that maintains a national database and sells and licenses the database. The faxes at issue informed recipients, in part, that "[a]s part of ongoing data maintenance of our Optum Provider Database product, Optum regularly contacts healthcare practitioners to verify demographic data regarding your office location(s)" and that "[b]y taking a few minutes to verify your practice information is current, your information will be promptly updated in Optum Provider Database." *Id.* at 132. The Third Circuit held that these faxes could not constitute advertisements because they "did not attempt to influence the purchasing decisions of any potential buyer, whether a recipient of a fax or a third party" and "did not encourage [plaintiff] to

influence the purchasing decisions or those of a third party." *Id.* at 135-36.

Here, Plaintiff alleges the fax "advertised the commercial availability or qualify of property, goods, or services." Compl. at ¶ 17. Under controlling Sixth Circuit law, the fax sent by Solstice is undoubtedly not an advertisement because the fax does not promote the sale of Solstice's products or services, but rather is only informational. As Plaintiff should know, it is a participating provider in a dental care network owned by United Concordia Companies, Inc. (the "Network"). *See* Ex. B.[1] Pursuant to a Network Access Agreement effective July 1, 2016, United Concordia Companies, Inc. ("UCCI") leased the Network to Solstice. *See generally* Ex. C.[2] Through the lease, Solstice processes and pays claims submitted by participating dental care providers (such as Plaintiff). *See id.* at § 3.1. Solstice does not sell anything to Plaintiff, but rather only processes and pays claims that it and other dental care providers submit for insured patients on the Network, which includes a number of plans.

With that context, it is plain that Solstice's fax is not a solicitation or

---

[1] Neither Plaintiff nor his lawyers can deny knowledge of the document. More than six months before Plaintiff commenced this lawsuit, UCCI filed it in another TCPA lawsuit brought by Plaintiff and the same lawyers representing his dental practice in this case in support of UCCI's motion to dismiss. *See Lyngaas v. United Concordia Companies, Inc.*, No. 2:21-cv-11604-SJM-APP, Dkt. No. 4-2 (E.D. Mich. Sept. 20, 2021).

[2] Solstice has attempted to obtain Plaintiff's assent to a confidentiality order to enable the disclosure of the unredacted Network Access Agreement, but has received no response. Without such an order in place, Solstice is redacting the confidential portions of the document, which are not necessary for Plaintiff and its lawyers to evaluate and respond to this Motion or for the Court to decide it.

advertisement to sell anything to Plaintiff for profit, but rather is informational. Solstice's fax to Plaintiff merely lists four different dental plans that Solstice offers to its customers, and states that there are over 25,000 members spread between those plans. Solstice references the plans and how to verify eligibility in the plans, but only to inform the Plaintiff that it may be a contracted provider for one or all of the listed plans and to advise how it may submit claims for payment. *See* Compl., Ex. A. ***Significantly, no product or service is being offered for sale to Plaintiff***. ***No money is being sought from Plaintiff***. To the contrary, the fax informed Plaintiff about four dental plans with over 25,000 members for which Solstice is able to process and pay claims ***to*** Plaintiff through the Network.

Like in *Sandusky*, *Florence*, and *Mauthe*, where the courts found the faxes were not advertisements because the faxes did not promote the sale of the defendants' products, Solstice's fax is not an advertisement because it does not promote the sale of Solstice's products to Plaintiff – as it does not sell any – but only provides information regarding an agreement to which Plaintiff is already a party, namely being a provider on the Network and its attendant.[3] Because Solstice's fax merely provides information to Plaintiff regarding plans on a provider network that

[3] *See* Ex. B at § 2 ("Dentist agrees to participate at all practice locations with all United Concordia Fee for Service Programs and in any other plan, program or arrangement for which United Concordia has agreed to provide access to the Network ('Network Access Arrangements'). Dentist specifically authorizes United Concordia to enter into Network Access Arrangements and agrees to provide services to Members enrolled under any Network Access Arrangement, subject to all of the terms and conditions of this Agreement.").

Plaintiff is already part of, the fax at issue is clearly not an advertisement under the TCPA. Any attempt to suggest otherwise is clearly a frivolous attempt to place liability on the part of the Defendant where no liability exists. *See Sandusky*, 788 F.3d at 221.

There is no way around this controlling case law. Nor is Plaintiff a stranger to the provider networks to which it is a party. Plaintiff and his counsel knew or should have discerned what a reasonable lawyer would have concluded following a reasonable inquiry into the law and the facts: the fax from Solstice was plainly not an advertisement, but rather was informational, and thus any TCPA claim over this non-advertisement is frivolous. Even if somehow this combination of law and facts was not within their apprehension before filing suit, they now clearly are on notice and should do what a reasonable lawyer would do, withdraw the one-count Complaint. *See Dearborn St. Bldg. Assocs., LLC v. Huntington Nat. Bank*, 411 F. App'x 847, 851 (6th Cir. 2011) ("Rule 11 sanctions are . . . proper where, as here, instead of withdrawing a complaint or agreeing to dismissal, a plaintiff 'continued to litigate after it became clear that his claim was frivolous, unreasonable or without foundation.'") (quoting *Bailey v. Papa John's USA, Inc.*, 236 Fed. Appx. 200, 203 (6th Cir. June 11, 2007)); *Runfola*, 88 F.3d at 374 ("[T]he plaintiff is impressed with a continuing responsibility to review and reevaluate his pleadings and where appropriate modify them to conform to Rule 11."). The Court should therefore

impose sanctions under Rule 11.

## V. Plaintiff Gave Prior Express Permission to Receive Faxes from Solstice

The Complaint is also objectively frivolous for another reason: the fax sent by Solstice was not unsolicited. Under the Telephone Consumer Protection Act of 1991, as a general matter, the sending of an advertisement via fax is unlawful only if it is "unsolicited." *See* 47 U.S.C. §§ 227(a)(5) & (b)(1)(C). An advertisement is "unsolicited" if it is "transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *See* 47 U.S.C. § 227(a)(5). Here, Solstice's fax is not unsolicited because Plaintiff gave express permission to receive faxes from Solstice.

Plaintiff's Participating Dentist Agreement with UCCI demonstrates Plaintiff's prior express permission to be contacted by and sent faxes from Solstice in simple and concise terms. Through the Participating Dentist Agreement, Plaintiff is a contracted provider for several different dental plans through UCCI's network of providers. *See* Ex. B. As discussed above, this Network is leased to Solstice through the Network Access Agreement. *See* Ex. C. The first paragraph of the first page of the Participating Dentist Agreement states that both UCCI and its affiliates are collectively referred to as "United Concordia" in the Participating Dentist Agreement. *See* Ex. B at 1. In Section 1(d) of that same agreement, "Dentist [Plaintiff] agrees to accept communications from United Concordia via mail,

***facsimile*** or e-mail at the addresses/numbers shown on Dentist's Credentialing Application." *Id.* at § 1(d) (emphasis added). By signing the Participating Dentist Agreement, Plaintiff expressly gave his permission to be sent faxes from UCCI's affiliates. Solstice is an affiliate of UCCI, at least for purposes of the Network in which the Plaintiff is a participating provider, by way of leasing UCCI's Network. *See generally* Ex. C.

Similarly, Section 2 of the Participating Dentist Agreement specifically states, "Dentist agrees to participate at all practice locations with all United Concordia Fee for Service Programs and in any other plan, program or arrangement for which United Concordia has agreed to provide access to the Network ('Network Access Arrangements')," *e.g.*, Solstice under the Network Access Agreement. Ex. B at § 2. Therefore, Plaintiff gave its express permission to be contacted by fax sent from, among others, Solstice.

Even the most rudimentary inquiry would have revealed this information prior to the filing of Plaintiff's Complaint. Plaintiff and its counsel failed to conduct the most basic type of investigation, which, had they done so, would have alerted them to this business relationship and express permission to receive faxes.

Indeed, through the Participating Dentist Agreement, Plaintiff was not only contractually obligated to provide his dental services to those with whom UCCI agreed to provide access to the Network under "Network Access Arrangements,"

such as Solstice, but was also bound to participate and "comply with all policies and procedures governing the administration of [UCCI's Network] and all Network Access Arrangements, including but not limited to: claim submission, complaints, grievances, utilization review, and quality management . . . ." *Id.* Plaintiff knew that its dental practice's information would be disseminated to the Network's claims processors and payers, such as Solstice, in order for them to contact it; payers need to give providers notice of their policies and programs with which the providers are contractually bound to comply and participate. Solstice's facsimile is exactly this. Solstice, a claims processor and payer, transmitted information to Plaintiff, a dental care provider on the Network, that outlined the Solstice programs and policies in which Plaintiff was obligated to participate. Once again, Plaintiff expressly gave permission for Solstice to communicate with his dental practice via facsimile.

A reasonable inquiry by Plaintiff's attorneys would have shown that Solstice is a payer utilizing the Network and that Plaintiff, as a participating provider, has given prior express permission to be contacted by the Network's payers in the manner done by Solstice's facsimile. Clearly, no such inquiry took place.

## VI. Sanctions Sought

In the event Plaintiff does not withdraw its Complaint within twenty-one days of service of this Motion for Rule 11 Sanctions, Solstice seeks its reasonable attorneys' fees for reviewing, considering and responding to the Plaintiff's

Complaint, for its Motion for Rule 11 Sanctions and any reply, and for all other fees and costs incurred in this lawsuit as the frivolous Complaint should not have been filed. Solstice asks that its entitlement be determined by the Court at this stage and that the amount of the award be determined upon the subsequent submission of a motion for attorneys' fees and costs.

**VII. Conclusion**

For the foregoing reasons, the Court should impose sanctions against Plaintiff Brian J. Lyngaas D.D.S., P.L.L.C. and the law firms of Bock Hatch & Oppenheim, LLC and Shenkan Injury Lawyers, PLLC, and their attorneys. They commenced this action and filed a frivolous Complaint not well grounded in fact or law and without conducting a reasonable inquiry that would have revealed these significant deficiencies and caused a reasonable attorney to refrain from filing.

Dated: August 23, 2022

GREENSPOON MARDER LLP

/s/ *Jeffrey A. Backman*
Jeffrey A. Backman
Roy Taub
200 East Broward Blvd., Suite 1800
Fort Lauderdale, Florida 33301
954.491.1120 (Telephone)
954.343.6958 (Facsimile)
jeffrey.backman@gmlaw.com
roy.taub@gmlaw.com

SMITH HAUGHEY RICE & ROEGGE, PC
Kristen E. Guinn P72148

100 Monroe Center NW
Grand Rapids, MI 49503
(616) 458-6245 (Telephone)
(616) 774-2461 (Facsimile)
kguinn@shrr.com

*Attorneys for Defendant*
*Solstice Benefits, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, in compliance with Federal Rule of Civil Procedure 11(c)(2), a true and correct copy of the foregoing was served on August 23, 2022 by email and by FedEx overnight delivery upon the following:

Phillip A. Bock
Robert M. Hatch
BOCK HATCH & OPPENHEIM, LLC
203 N. La Salle Street, Ste. 2100
Chicago, IL 60601
Telephone: 312-658-5500
Facsimile: 312-658-5555
phil@classlawyers.com
service@classlawyers.com

Richard E. Shenkan
SHENKAN INJURY LAWYERS, PLLC
6550 Lakeshore Street
West Bloomfield, MI 48323
Telephone: 1-800-601-0808
Facsimile: 1-888-769-1774
rshenkan@shenkanlaw.com

*Attorneys for Plaintiff*

I HEREBY FURTHER CERTIFY that a true and correct copy of the foregoing was served on all counsel of record via filing on CM/ECF on ________________________.

*/s/ Jeffrey A. Backman*
JEFFREY A. BACKMAN

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| BRIAN J. LYNGAAS, D.D.S., P.L.L.C., individually and as the representative of a class of similarly-situated persons,<br><br>Plaintiff,<br><br>v.<br><br>SOLSTICE BENEFITS, INC. and JOHN DOES 1-5,<br><br>Defendants. | ) | No.<br><br><br>**CLASS ACTION** |

## CLASS ACTION COMPLAINT

Plaintiff, Brian J. Lyngaas, D.D.S., P.L.L.C. ("Plaintiff"), brings this class action on behalf of itself and all other persons similarly situated and, except as to those allegations pertaining to Plaintiff or its attorneys, alleges the following upon information and belief against defendant Solstice Benefits, Inc. ("Solstice"):

## PRELIMINARY STATEMENT

1. Solstice violated the Telephone Consumer Protection Act, 47 USC § 227 (the "TCPA"), by sending unsolicited advertisements to Plaintiff and others by facsimile.

2. An "unsolicited advertisement" is "any material advertising

the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." 47 U.S.C. § 227(a)(5).

3. The TCPA provides a private right of action and provides minimum statutory damages of $500 per violation. If the unsolicited advertisement was sent knowingly or willfully, then the Court can increase the damages up to three times, or $1,500 per violation. 47 U.S.C. § 227(b)(3).

4. On or about April 23, 2018, Plaintiff received an unsolicited advertisement on its fax machine from "Solstice" or "Solstice Benefits." A true and correct copy of that fax is attached as Exhibit A. Plaintiff's fax machine received and automatically printed the fax upon receipt.

5. Solstice did not have Plaintiff's prior express invitation or permission to send any advertisement by fax.

6. Plaintiff had no "established business relationship" with Solstice.

7. Faxed advertisements cause concrete damage to the recipients, such as wasting valuable time attempting to discern the source and purpose of the fax, interrupting privacy, tying up telephone

lines, preventing fax machines from receiving authorized faxes or sending outgoing faxes, wasting paper and ink toner, causing undue wear and tear on fax machines, and increasing costs or wasting fax resource allocations.

8. On behalf of itself and all others similarly situated, Plaintiff seeks statutory damages and other relief for each of Solstice's violations of the TCPA occurring during the statutory limitations period commencing four years prior to the filing of this action and continuing until the Court orders notice to a certified class.

## PARTIES, JURISDICTION, AND VENUE

9. Plaintiff, Brian J. Lyngaas, D.D.S., P.L.L.C., is a dental practice located at 18518 Farmington Road, Livonia, Michigan 48152, which is in Wayne County.

10. Defendant, Solstice Benefits, Inc., is a Florida corporation with its principal place of business located at 7901 SW 6th Court, Suite 400, Plantation, FL 33324.

11. Defendants John Does 1-5 are unknown persons liable as "senders" of some or all the facsimiles at issue.

Case 2:22-cv-10830-LVP-ECF No. 1-1, PageID.34 Filed 04/18/22 Page 4 of 26

12. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227.

13. Personal jurisdiction exists over Solstice in Michigan because it has committed tortious acts in the State by sending unlawful fax advertisements to Michigan residents.

14. Venue is proper in the Eastern District of Michigan, Southern Division, because Solstice committed statutory torts within this District and a significant portion of the events took place here.

## FACTS

15. Solstice has sent unsolicited advertisements by facsimile to Plaintiff and a class of similarly-situated persons.

16. Attached as Exhibit A is a true and correct copy of a one-page document Plaintiff received on its facsimile machine on or about April 23, 2018.

17. Exhibit A advertised the commercial availability or quality of property, goods, or services.

18. Exhibit A states that it is an advertisement: "The recipient is entitled to request that the sender not send any future advertisements to its telephone facsimile machines."

19. According to Exhibit A, sent in April 2018, Solstice was "happy to announce its January 1, 2018" selection as a "carrier" for the "dental PPO, DHMO, and Discount benefits administration" of "The National Association for Medical and Dental, Inc./Healthcare National Marketing, Inc.," a group which "has over 25,000 members who will choose betweenone [sic] of the plans listed below." Exhibit A.

20. Plaintiff was not a member of the identified group.

21. Exhibit A states, "You may be a contracted provider for one or all plans," but Plaintiff had no contract with Solstice.

22. By touting the company's selection by a 25,000-member group, Exhibit A advertised the commercial availability or quality of Solstice's goods or services.

23. Exhibit A says to "reach out to your local Solstice Provider Relations Representative" with any questions about the fax, but Plaintiff had no such representative.

24. Exhibit A invited the recipient to "log into (or create an account)Mysolstice.net [sic] before providing any plan benefits."

25. Solstice is not registered with the Michigan Secretary of State to do business in Michigan.

26. Solstice is not licensed by the Michigan Department of Insurance and Financial Services.

27. According to www.solsticebenefits.com:

> "Solstice" is the brand name for plans, products, and services provided by the subsidiaries and affiliate companies of Solstice Benefits, Inc. Plans, products, and services are provided by one or more Solstice entities. Not all plans, products, and services are available in each state. Solstice legal entities include: Solstice Benefits, Inc., Solstice Health Insurance Company, Solstice Healthplans, Inc., Solstice Healthplans of Arizona, Inc., Solstice of Illinois, Inc., Solstice Healthplans of Ohio, Inc., Solstice Healthplans of Texas, Inc., Solstice of New York, Inc., Solstice Administrators, Inc., Solstice Administrators of Alabama, Inc., Solstice Administrators of Arizona, Inc., Solstice of Minnesota, Inc., Solstice Administrators of Missouri, Inc., Solstice Administrators of North Carolina, Inc., Solstice Administrators of Texas, Inc., Claims Management Systems, Inc. Administrative Office for all Solstice entities: 7901 SW 6th Ct., Ste. 400, Plantation, FL 33324. 954.370.1700.

www.solsticebenefits.com (last visited 4/15/2022).

28. An August 20, 2021, article on TheSeniorList.com, entitled "Best Affordable Dental Insurance," describes Solstice as follows:

> Solstice offers prepaid, DHMO, indemnity, and PPO plans along with discount dental programs. They are currently offering plans in six states (AZ, FL, GA, NJ, NY, TN).

https://www.theseniorlist.com/insurance/dental/best/affordable/ (last visted 4/15/22).

29. Solstice did not have Plaintiff's prior express invitation or permission to send an advertisement by facsimile.

30. Plaintiff did not have an "established business relationship" with Solstice.

31. Although Exhibit A contains an opt-out notice, the notice was legally irrelevant and did not make the fax "solicited," because Solstice did not have an established business relationship with Plaintiff.

32. The opt-out notice Solstice included on Exhibit A is given in the smallest font on the page and not clear and conspicuous.

33. On information and belief, Solstice sent unsolicited advertisements by facsimile to more than 40 persons. Exhibit A is a generic form announcement with graphics and trademarks and no personalized information—*e.g.*, it is addressed to "Dear Doctor,"—it shows a variety of typographical errors, and sending advertisements in bulk by fax is an inexpensive way to reach a wide audience.

34. Plaintiff intends to discover the various unsolicited advertisements that Solstice sent by fax. *See* Exhibit B, a Demand for Preservation of All Tangible Documents Including Electronically Stored Information.

35. Plaintiff and the other class members owe no obligation to protect their fax machines from Solstice's unlawful advertisements. Their fax machines are ready to send and receive their urgent communications, or private communications about patients' dental needs, not to receive junk faxes.

## CLASS REPRESENTATION ALLEGATIONS

36. Plaintiff brings this action as a class action on behalf of itself and a class of all others similarly situated and initially defined as follows:

> All persons sent one or more facsimiles from Solstice on any date after April 17, 2018, advertising the commercial availability or quality of property, goods, or services.

Excluded from the class are Solstice, any entity in which Solstice has a controlling interest, Solstice's employees, officers and directors, Solstice's legal representatives, heirs, successors, and assigns, and any Judge assigned to this action, and his or her family.

37. Plaintiff anticipates modifying the proposed class definition—including proposing subclasses if appropriate—after discovery about the scope of Solstice's fax advertising practices as well as discovery as to any potential affirmative defenses Solstice may plead.

38. This action is brought, and may properly be maintained as, a class action under Fed. R. Civ. P. 23. This action satisfies Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements. Additionally, prosecution of Plaintiff's claims separately from the putative class's claims would create a risk of inconsistent or varying adjudications under Rule 23(b)(1)(A). Furthermore, the questions of law or fact that are common in this action predominate over any individual questions of law or fact making class representation the superior method to adjudicate this controversy under Rule 23(b)(3).

<u>Numerosity/Impracticality of Joinder</u>

39. On information and belief, the class includes more than forty persons and, thus, is so numerous that joinder of all members is impracticable. The precise number of class members and their identities are unknown to Plaintiff, but can be obtained from Solstice's records or the records of third parties.

<u>Commonality and Predominance</u>

40. There is a well-defined community of interest and common questions of law and fact that predominate over any question affecting only individual members of the class. These common legal and factual

questions, which do not vary from one class member to another, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to the following:

a. Whether Solstice sent unsolicited advertisements by fax;

b. Whether Solstice's fax advertised the commercial availability or quality of property, goods, or services;

c. The manner and method Solstice used to compile or obtain the lists of fax numbers to which it sent advertisements by fax;

d. Whether Solstice faxed advertisements without obtaining prior express invitation or permission to do so;

e. Whether Solstice sent advertisements by facsimile without having an established business relationship with the recipients;

f. Whether Solstice's facsimiles contained an opt-out notice that complied with the TCPA's requirements, including the requirement that the notice must be clear and conspicuous;

g. Whether Solstice is directly or vicariously liable for violating the TCPA;

h. Whether Plaintiff and the other class members are entitled to statutory damages;

i. Whether the Court should treble the statutory damages; and

j. Whether Solstice should be enjoined from sending unsolicited advertisements by facsimile in the future.

<u>Typicality of Claims</u>

41. Plaintiff's claims are typical of the claims of the other class members because all were injured by the same wrongful practices. Plaintiff and the members of the class received Solstice's unsolicited advertisements by facsimile. If Plaintiff prevails on its claims, then the putative class members will prevail as well.

<u>Adequacy of Representation</u>

42. Plaintiff is an adequate representative of the class. Plaintiff's interests do not conflict with the interests of the class. Plaintiff has retained counsel competent and experienced in complex class action litigation, and TCPA litigation in particular, and Plaintiff intends to

Case 2:22-cv-10830-LVP-CI ECF No. 1, PageID.12 Filed 04/18/22 Page 12 of 46

vigorously prosecute this action. Plaintiff and its counsel will fairly and adequately protect the interest of members of the class.

## A Class Action is the Superior Method of Adjudicating the Common Questions of Law or Fact that Predominate over Individual Questions

43. A class action is superior to other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all class members is economically unfeasible and procedurally impracticable. Class members do not have strong interests in individually controlling the prosecution of separate actions. There is no other litigation pending regarding fax advertisements from Solstice. Management of these claims and their resolution as a class action will not be difficult.

## COUNT I
## TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227

44. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

45. Plaintiff brings Count I on behalf of itself and a class of similarly-situated persons.

46. The TCPA provides:

> 3. Private right of action. A person may, if otherwise permitted by the laws or rules of court

> of a state, bring in an appropriate court of that state:
>
> (A) An action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
>
> (B) An action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or
>
> (C) Both such actions.

47 U.S.C. § 227(b)(3).

47. The TCPA prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine…." 47 U.S.C. § 227(b)(1).

48. The TCPA defines "unsolicited advertisement," as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227(a)(4).

49. Exhibit A is an unsolicited advertisement Solstice sent or caused to be sent by fax to Plaintiff.

50. Plaintiff intends to discover and include all unsolicited advertisements Solstice sent by fax.

51. Solstice violated 47 U.S.C. § 227 *et seq.* by sending advertisements by fax to Plaintiff and the other class members without their prior express invitation or permission and, to the extent Solstice contends it sent one or more advertisements by facsimile because of an "established business relationship" with the recipient, by failing to include the clear and conspicuous opt-out notice required on such facsimiles. 47 U.S.C. § 227(b)(2)(D)(i).

52. The FCC's regulations of opt-out notices on facsimile advertisements are set forth at 47 C.F.R. § 64.1200(a)(4)(iii).

53. Solstice is liable because it sent the faxes, caused the faxes to be sent, participated in the activity giving rise to and/or constituting the violation, the faxes were sent on its behalf, and/or under general principles of vicarious liability applicable under the TCPA, including actual authority, apparent authority, and ratification.

54. Solstice knew or should have known that Plaintiff and the other class members had not given express invitation or permission to send them Solstice's advertisements by facsimile and that the faxes did not display the opt-out notice clearly and conspicuously.

55. Even if Solstice did not intend to cause damage to Plaintiff and the other class members, did not intend to violate their privacy, and did not intend to waste the recipients' valuable time with Solstice's advertisements, those facts are irrelevant because the TCPA is a strict liability statute.

56. The Court, in its discretion, can treble the statutory damages if the violation was knowing or willful. 47 U.S.C. § 227.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly-situated, demands judgment in its favor and against Solstice, as follows:

A. That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B. That the Court award $500 in statutory damages for each of Solstice's violations of the TCPA;

C. That the Court treble the statutory damages to $1,500 per violation if it finds that Solstice knowingly or willfully violated the TCPA;

D. That the Court enter an injunction prohibiting Solstice from sending advertisements by fax without first demonstrating that it has obtained express invitation or permission to fax advertisements; and

E. That the Court award costs and such further relief as the Court may deem just and proper.

Respectfully submitted,

BRIAN J. LYNGAAS, D.D.S., P.L.L.C.,
individually and as the representative
of a class of similarly-situated persons,

By: /s/ Phillip A. Bock
One of their attorneys

Phillip A. Bock
Robert M. Hatch
BOCK HATCH & OPPENHEIM, LLC
203 N. La Salle Street, Ste. 2100
Chicago, IL 60601
Telephone: 312-658-5500
Facsimile: 312-658-5555
Email: service@classlawyers.com

Richard E. Shenkan
SHENKAN INJURY LAWYERS, PLLC
6550 Lakeshore Street
West Bloomfield, MI 48323
Telephone: 1-800-601-0808
Facsimile: 1-888-769-1774
Email: rshenkan@shenkanlaw.com

# EXHIBIT A

Solstice

April 2018

RE: Solstice Welcomes The National Association for Medical and Dental, Inc/Healthcare National Marketing, Incl

Dear Doctor,

Solstice is happy to announce that effective January 1, 2018***The National Association for Medical and Dental, Inc/Healthcare National Marketing, Inc.***has selected us as their carrier for theirdental PPO, DHMO, and Discount benefits administration. This group has over 25,000 members who will choose betweenone of the plans listed below:

- Solstice PPO
- DHMO-500B
- Discount Plan-Plus Plan One
- Discount Plan-Plus Plan Complete

**You may be a contracted provider for one or all plans.**

To verify eligibility, log into (or create an account)**Mysolstice.net** before providing any plan benefits.

Claims should be submitted to:

**Solstice**
**P.O. Box 14009**
**Lexington, KY 40512-4009**
**Payor ID: 76578**
**NEA: Solstice Benefits**

You can always call and verify eligibility information through ourInteractive Voice Response (IVR) system and request a faxed verification of eligibility thru our IVR by calling 877.760.2247.

Should you have any questions about this letter you may contact our Customer Service Department Monday thru Friday 8:00am to 6:00pm at 877.760.2247.You can also reach out to your local Solstice Provider Relations Representative or email ProviderRelations@SolsticeBenefits.com.

We look forward to continuing to promote your practice through our growing membership base!

Sincerely,

Your Dedicated Provider Relations Team

The recipient is entitled to request that the sender not send any future advertisements to its telephone facsimile machines. Failure to comply within 30 days from the date the request is properly made is unlawful. 866-632-3510 is the telephone number and 954-525-5852 is the fax number for the recipient to transfer such opt-out request.

P.O. Box 19199 * Plantation, FL 33318
877.760.2247
SolsticeBenefits.com

# EXHIBIT B

# BOCK HATCH & OPPENHEIM, LLC

203 North La Salle Street, Suite 2100
Chicago, IL 60601
312-658-5500 (Phone) • 312-658-5555 (Fax)

April 18, 2022

**ATTACHED TO COMPLAINT**

Solstice Benefits, Inc.
7901 SW 6th Court
Suite 400
Plantation, FL 33324

Re: **Demand for Preservation of Tangible Documents and Electronically Stored Information in *Brian J. Lyngaas D.D.S., P.L.L.C. v Solstice Benefits, Inc.***

Dear Sir or Madam:

We represent Brian J. Lyngaas, D.D.S., P.L.L.C., on behalf of itself and a class of similarly-situated persons ("Plaintiff") in the captioned class action case. Plaintiff alleges that Solstice Benefits, Inc. ("Defendant") sent unsolicited advertisements by fax in violation of the TCPA.

We consider electronic data to be a valuable and irreplaceable source of discovery and evidence in this matter. The laws and rules prohibiting the destruction of evidence apply to electronic data with the same force as they apply to other kinds of evidence.

Plaintiff hereby demands that you preserve all documents, tangible things, and electronically-stored information potentially relevant to the issues in this cause. As used in this document, "you" and "your" refers to Solstice Benefits, Inc., and its predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective officers, directors, agents, attorneys, accountants, employees, partners or other persons occupying similar positions or performing similar functions.

You should anticipate that much of the information subject to disclosure or responsive to discovery in this matter is stored on your current and former computer systems and other media and devices (including personal digital assistants, voice-messaging systems, online repositories and cell phones).

Electronically-stored information (hereinafter “ESI”) should be afforded the broadest possible definition and includes (by way of example, but not as an exclusive list) potentially relevant information electronically, magnetically or optically stored as:

- Image and Facsimile Files (e.g., .PDF, .TIFF, .JPG, .GIF images);
- Digital communications (e.g., e-mail, voice mail, instant messaging);
- Word processed documents (e.g., Word or WordPerfect documents and drafts);
- Spreadsheets and tables (e.g., Excel or Lotus 123 worksheets);
- Network Access and Server Activity Logs;
- Databases (e.g., Access, Oracle, SQL Server data, SAP);
- Contact and Relationship Management Data (e.g., Outlook, ACT!);
- Calendar and Diary Application Data (e.g., Outlook PST, Yahoo, blog tools);
- Online Access Data (e.g., Temporary Internet Files, History, Cookies);
- Presentations (e.g., PowerPoint, Corel Presentations)
- Project Management Application Data; and
- Back Up and Archival Files (e.g., Zip, .GHO).

ESI also includes information or data stored on proprietary software, databases or systems.

ESI resides not only in areas of electronic, magnetic and optical storage media reasonably accessible to you, but also in areas you may deem not reasonably accessible. You are obliged to preserve potentially relevant evidence from both these sources of ESI, even if you do not anticipate producing such ESI.

The demand that you preserve both accessible and inaccessible ESI is reasonable and necessary. Pursuant to amendments to the Federal Rules of Civil Procedure that have been approved by the United States Supreme Court (eff. 12/1/05), you must identify all sources of ESI you decline to produce and demonstrate to the court why such sources are not reasonably accessible. For good cause shown, the court may then order production of the ESI, even if it finds that it is not reasonably accessible. Accordingly, even ESI that you deem reasonably inaccessible must be preserved in the interim so as not to deprive Plaintiff of its right to secure the evidence or the Court of its right to adjudicate the issue.

### A. Preservation Requires Immediate Intervention

You must act immediately to preserve potentially relevant ESI including, without limitation, information with the earlier of a Created or Last Modified date on or after May 18, 2016, through the date of this demand and concerning:

a. All electronic mail ("e-mail") and information about e-mail (including message contents, header information, and logs of e-mail systems usage) sent or received by Defendant, anyone relating to Defendant, or any employees or agents thereof;

b. All other e-mail and information about e-mail (including message contents, header information, and logs of e-mail systems usage) containing information about Defendant, Defendant's intended fax recipients, or any employees or agents thereof;

c. All databases (including all records and field structural information in such databases) containing any reference to and/or information about Defendant, Defendant's intended fax recipients, or any employees or agents thereof;

d. All logs of faxing activity (including all reports indicating success or failure of attempted transmission) containing information about Defendant, Defendant's intended fax recipients, or any employees or agents thereof;

e. All word processing files and file fragments containing information about Defendant, Defendant's intended fax recipients, or any employees or agents thereof;

f. All electronic data files and file fragments created by application programs that process financial, accounting, and billing information related to Defendant, or any employees or agents thereof;

g. All files and file fragments containing information from electronic calendars and scheduling programs regarding Defendant, or fax transmissions sent on behalf of Defendant, or any employees or agents thereof;

h. All electronic data files and file fragments created or used via electronic spreadsheet programs where such data files contain information about Defendant or Defendant's intended fax recipients;

i. All other electronic data containing information about Defendant or Defendant's intended fax recipients; and

j. All e-mail from third party sources that may contain references or correspondence relating to Plaintiff, Defendant and/or Defendant's intended fax recipients.

Adequate preservation of ESI requires more than simply refraining from efforts to destroy or dispose of such evidence. You must also intervene to prevent loss due to routine operations and employ proper techniques and protocols suited to protection of ESI. Be advised that sources of ESI are altered and erased by continued use of your computers and other devices. Booting a drive, examining its contents or running any application will irretrievably alter the evidence it contains and may constitute unlawful spoliation of evidence. Consequently, alteration and erasure may result from your failure to act diligently and responsibly to prevent loss or corruption of ESI. Nothing in this demand for preservation of ESI should be understood to diminish your concurrent obligation to preserve document, tangible things and other potentially relevant evidence.

**B. Suspension of Routine Destruction**

You are directed to immediately initiate a litigation hold for potentially relevant ESI, documents and tangible things, and to act diligently and in good faith to secure and audit compliance with such litigation hold. You are further directed to immediately identify, and modify or suspend, features of your information systems and devices that, in routine operation, operate to cause the loss of potentially relevant ESI. Examples of such features and operations include:

- Purging the contents of e-mail repositories by age, capacity or other criteria;
- Using data or media wiping, disposal, erasure or encryption utilities or devices;
- Overwriting, erasing, destroying or discarding back up media;
- Re-assigning, re-imaging or disposing of systems, servers, devices or media;
- Running antivirus or other programs effecting wholesale metadata alteration;
- Releasing or purging online storage repositories;
- Using metadata stripper utilities;
- Disabling server or IM logging; and,
- Executing drive or file defragmentation or compression programs.

**C. Preservation by Imaging**

You should take affirmative steps to prevent anyone with access to your data, systems and archives from seeking to modify, destroy or hide electronic evidence on network or local hard drives (such as by deleting or overwriting files, using data shredding and overwriting applications, defragmentation, re-imaging or replacing drives, encryption, compression, steganography or the like). With respect to local hard drives, one way to protect existing data on local hard drives is by the creation and authentication of a forensically qualified image of all sectors of the drive. Such a forensically qualified duplicate may also be called a bitstream image or clone of the drive. Be advised that a conventional back up of a hard drive is not a forensically qualified image because it only captures active, unlocked data files and fails to preserve forensically significant data that may exist in such areas as unallocated space, slack space and the swap file.

With respect to the hard drives and storage devices maintained offsite, including Cloud Based Data Storage, including any File Transfer Protocol Host Account or Server Storage, whether provided by a server owned or maintained by Defendant or its subsidiaries, agents, or contractors, or maintained by a company on behalf of Defendant, demand is made that you preserve the ESI on those devices.

With regard to all data storage for Defendant or any employee, subsidiary, contractor, or agent thereof, stop any activity which my result in the loss of such electronic data, including the rotation, destruction, overwriting, or erasure of such media in whole or in part, unless a true and correct copy of each such electronic file has been made and steps have been taken to assure that such copy will be preserved and accessible for purposes of this litigation.

**D. Preservation in Native Form**

You should anticipate that certain ESI, including but not limited to spreadsheets and databases, will be sought in the form or forms in which it is ordinarily maintained. Accordingly, you should preserve ESI in such native forms, and you should not select methods to preserve ESI that remove or degrade the ability to search your ESI by electronic means or make it difficult or burdensome to access or use the information efficiently in the litigation. You should additionally refrain from actions that shift ESI from reasonably accessible media and forms to less accessible media and forms if the effect of such actions is to make such ESI not reasonably accessible.

**E. Metadata**

You should further anticipate the need to disclose and produce system and application metadata and act to preserve it. System metadata is information describing the history and characteristics of other ESI. This information is typically associated with tracking or managing an electronic file and often includes data reflecting a file's name, size, custodian, location and dates of creation and last modification or access. Application metadata is information automatically included or embedded in electronic files but which may not be apparent to a user, including deleted content, draft language, commentary, collaboration and distribution data and dates of creation and printing. Be advised that metadata may be overwritten or corrupted by careless handling or improper steps to preserve ESI. For e-mail, metadata includes all header routing data and Base 64 encoded attachment data, in addition to the To, From, Subject, Received Date, CC and BCC fields.

### F. Servers

With respect to servers like those used to manage e-mail (*e.g.*, Microsoft Exchange, Lotus Domino) or network storage (often called a user's "network share"), the complete contents of each user's network share and e-mail account should be preserved. There are several ways to preserve the contents of a server depending upon, *e.g.*, its RAID configuration and whether it can be downed or must be online 24/7. Please call to discuss the sufficiency of preservation methods if you have questions.

### G. Ancillary Preservation

You must preserve documents and other tangible items that may be required to access, interpret or search potentially relevant ESI, including programs, utilities, logs, control sheets, specifications, indices, naming protocols, file lists, network diagrams, flow charts, instruction sheets, data entry forms, abbreviation keys, user ID and password rosters, legacy or proprietary devices, and the like.

### H. Paper Preservation of ESI is Inadequate

As hard copies do not preserve electronic searchability or metadata, they are not an adequate substitute for, or cumulative of, electronically-stored versions. If information exists in both electronic and paper forms, you should preserve both forms.

### I. Agents, Attorneys, and Third Parties

Your preservation obligation extends beyond ESI in your care, possession or custody and includes ESI in the custody of others that is subject to your direction or control. Accordingly, you must notify any current or former agent, attorney, employee, custodian or contractor in possession of potentially relevant ESI to preserve such ESI to the full extent of your obligation to do so, and you must take reasonable steps to secure their compliance.

### J. Preservation Protocols

We desire to work with you to agree upon an acceptable protocol for forensically sound preservation and can supply a suitable protocol, if you will furnish an inventory of the systems and media to be preserved. Alternatively, if you will promptly disclose the preservation protocol you intend to employ, perhaps we can identify any points of disagreement and resolve them. A successful and compliant ESI preservation effort requires expertise. If you do not currently have such expertise at your disposal, we urge you to engage the services of an expert in electronic evidence and computer forensics. Perhaps our respective expert(s) can work cooperatively to secure a balance

between evidence preservation and burden that is fair to both sides and acceptable to the Court.

**K. Do Not Delay Preservation**

I am available to discuss reasonable preservation steps; however, you should not defer preservation steps pending such discussions if ESI may be lost or corrupted because of delay. Should your failure to preserve potentially relevant evidence result in the corruption, loss or delay in production of evidence to which we are entitled, such failure would constitute spoliation of evidence, and we will not hesitate to seek sanctions.

**L. Confirmation of Compliance**

Please confirm that you have taken the steps outlined in this letter to preserve ESI and tangible documents potentially relevant to this action. If you have not undertaken the steps outlined above, or have taken other actions, please describe what you have done to preserve potentially relevant evidence.

Respectfully,

*/s/ Phillip A. Bock*

Phillip A. Bock
Bock Hatch & Oppenheim, LLC
203 N. LaSalle St., Suite 2100
Chicago, IL 60601
(312) 658-5501

# EXHIBIT B

# UNITED CONCORDIA

## *Participating Dentist Agreement with United Concordia Companies, Inc.*

Under the applicable laws of the State of Michigan, I am duly authorized to engage in the practice of dentistry. In consideration for being registered as a participating dentist in the Fee for Service Dental Network (the "Network") of United Concordia Companies, Inc. and its affiliates (collectively, "United Concordia"), I ("Dentist") do hereby agree as follows:

1.a. Dentist acknowledges that United Concordia, on consideration of certain Selection Criteria, may decline to enroll, or to retain, providers in the Fee for Service Dental Network. Dentist shall submit a Credentialing Application attesting to information relevant to the Selection Criteria upon application for acceptance to the Network, and thereafter upon request. The Selection Criteria will comply with any state regulatory requirements (which may differ depending on Dentist's state of licensure) and will be available to all participating dentists. Dentists may appeal any decision regarding selection or retention for the Network through United Concordia's appeal process.

b. Dentist represents and warrants that he/she is licensed to practice in the aforementioned State and that such license has not been suspended, revoked or limited within the past five (5) years. Dentist further represents and warrants that his/her employees and facilities are licensed to the extent required by State law and shall only provide those services to Members as defined within the scope of their respective licenses. All of Dentist's rights and United Concordia's obligations under this Agreement are conditioned upon Dentist's and his/her employees continued maintenance of such licensure with no restrictions. United Concordia may begin the process to terminate this Agreement immediately upon notice if Dentist's license is suspended, revoked or limited in any way or if Dentist's conduct may result in immediate injury or damage to the health/safety of any Member.

c. During the term of this agreement, the Dentist agrees to maintain professional liability insurance at: (a) the level required by any applicable state mandate, (b) $200,000 per occurrence and $600,000 for aggregate occurrences, or (c) other level acceptable to United Concordia, based on accepted standards in Dentist's geographic area and risk factors applicable to Dentist's practice.

d. Dentist agrees to accept communications from United Concordia via mail, facsimile or e-mail at the addresses/numbers shown on Dentist's Credentialing Application.

2. Dentist agrees to participate at all practice locations with all United Concordia Fee for Service Programs and in any other plan, program or arrangement for which United Concordia has agreed to provide access to the Network ("Network Access Arrangements"). Dentist specifically authorizes United Concordia to enter into Network Access Arrangements and agrees to provide services to Members enrolled under any Network Access Arrangement, subject to all of the terms and conditions of this Agreement. A listing of all currently effective Network Access Arrangements is available on United Concordia's web site, www.unitedconcordia.com. Dentist will comply with all policies and procedures governing the administration of United Concordia's Fee for Service Plans and all Network Access Arrangements, including but not limited to: claim submission, complaints, grievances, utilization review, and quality management, as set forth in the most current version Dental Reference Guide, as it may be amended from time to time. The most current version of the Dental Reference Guide will be available for review on United Concordia's web site, www.unitedconcordia.com.

3. Dentist agrees to report all covered services for eligible Members on a timely basis following the date the services were rendered using an ADA claim form or other form acceptable to United Concordia.

4. Dentist agrees to accept his/her charge or the United Concordia Maximum Allowable Charge, whichever is lower, as payment in full for covered services and to bill the Member only for applicable deductibles, coinsurance, or amounts exceeding contractual maximums. In agreeing to this provision, Dentist understands that the most current applicable versions of the Maximum Allowable Charge (MAC) schedules will apply to reimbursement for all covered services. The current schedule of Maximum Allowable Charges, and dental policies that may affect the manner in which such charges are billed and reimbursed, are available on United Concordia's web site, www.unitedconcordia.com.

5. Dentist may bill a Member for non-covered services (which are defined as any service for which no payment is made under the applicable plan or arrangement for any reason, including but not limited to, services in excess of contractual maximums, services not covered under plan design, and services denied due to contractual limitations). Dentist's charge to Member for non-covered services may not exceed the Maximum Allowable Charge for the applicable CDT code as specified in the most current Maximum Allowable Charge schedule. Fees for all non-covered services will be collected from the Member, and not billed to United Concordia.

6. Dentist agrees that the services provided and charges made to United Concordia Members shall be consistent with those to his/her other patients.

7. Dentist may not bill a Member for charges itemized and distinguished from the professional services provided, including but not limited to, office overhead expenses, fees for completing claim forms, OSHA compliance surcharges, or costs of submitting additional information to United Concordia.

8. The determination of whether any services performed by Dentist for a Member are covered by that Member's contract shall be made by United Concordia. Fees for covered services deemed not dentally necessary shall not be collected from the Member unless the Dentist informs the Member of his/her specific financial liability in writing and the Member chooses to receive the service. The Dentist should appropriately note such notification to the Member in the Dentist's records.

9. Dentist shall be responsible, at all times, for maintaining emergency coverage provided in accordance with the guidelines of the ADA or applicable state laws.

10. Dentist will maintain accurate and complete dental records for all Members enrolled in the Plan.

11. Dentist shall furnish any information deemed necessary by United Concordia to make determinations of coverage and shall permit United Concordia representatives to make reasonable examinations of his/her clinical records, including x-rays, relating to covered services when such examination is necessary to resolve any question concerning such services.

12. Dentist is not an employee of United Concordia, and United Concordia shall do nothing to interfere with the customary Dentist-patient relationship.

13. All personally identifiable information about United Concordia dental plan Members ("Protected Health Information") is subject to various privacy standards, including the regulations adopted by the Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 45 CFR Parts 160, 162 and 164, and various state statutes and regulations protecting individual privacy. The parties will use or disclose Protected Health Information received from the other only as permitted by such privacy standards, or to comply with judicial process or regulatory mandate.

(Continued)

II.A.

14. Dentist shall indemnify and hold harmless United Concordia, those groups which have entered into contracts with United Concordia, and Members from any and all claims, liability, cost, damage or expense, for or as a result of any damage or loss occurring by reason of any failure by Dentist to comply with this Agreement, or as a result of any negligence, misfeasance, malfeasance or malpractice on the part of Dentist in performing services for Members.

15. United Concordia shall indemnify and hold harmless Dentist from any and all claims, liability, cost, damage or expense to the extent that such claims, liability, costs, damages, or expenses are solely caused by the negligence, misfeasance, malfeasance, nonfeasance on the part of United Concordia.

16. Dentist agrees not to discriminate in the treatment of Members as to the quality of service delivered because of race, sex, marital status, veteran status, age, religion, color, creed, sexual orientation, national origin, and disability, place of residence, health status or method of payment.

17. This agreement shall be effective only upon acceptance by United Concordia and shall continue in effect thereafter, until terminated by either party according to the following provisions:
a. Either party may terminate this Agreement upon sixty (60) days prior written notice.
b. United Concordia may terminate this Agreement immediately if Dentist fails to comply with the terms of this Agreement.
c. United Concordia may terminate this Agreement if Dentist no longer meets the Selection Criteria.

18. This Agreement may be modified or amended by United Concordia upon written notice to Dentist. If Dentist fails to object to the amendment within thirty (30) days of its receipt, the amendment will be deemed approved by Dentist.

19. Dentist's contractual rights and responsibilities hereunder shall not be assigned or delegated without the prior written consent of United Concordia. This Agreement shall be assignable by United Concordia to a subsidiary, affiliate, or Successor Corporation.

20. The terms set forth in the attached DEPARTMENT OF DEFENSE ADDENDUM TO THE PARTICIPATING DENTIST AGREEMENT WITH UNITED CONCORDIA COMPANIES, INC. shall govern all services provided to members of dental programs offered by the Department of Defense.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date below.

**To be completed by DENTIST:**

Date: 12-3-09

Signature: [signature]

Provider No.: [redacted]
SS No.: [redacted]
Tax ID No.: [redacted]
NPI No.: [redacted]

Print Name: Brian Lyngaas
Office Address: 51310 Van Dyke
Shelby Twp. MI 48316
Telephone No.: [redacted]

**To be completed by UNITED CONCORDIA:**

Date: March 27, 2009

Signature: [signature]

**EACH PROVIDER IN PRACTICE SHOULD SIGN A SEPARATE AGREEMENT**
*****PLEASE ATTACH A COPY OF YOUR CURRENT DENTAL LICENSE*****

ADV 01/05

UNITED CONCORDIA

## *Participating Dentist Agreement with United Concordia Companies, Inc.*

Under the applicable laws of the State of ________________, I am duly authorized to engage in the practice of dentistry. In consideration for being registered as a participating dentist in the Fee for Service Dental Network (the "Network") of United Concordia Companies, Inc. and its affiliates (collectively, "United Concordia"), I ("Dentist") do hereby agree as follows:

1.a. Dentist acknowledges that United Concordia, on consideration of certain Selection Criteria, may decline to enroll, or to retain, providers in the Fee for Service Dental Network. Dentist shall submit a Credentialing Application attesting to information relevant to the Selection Criteria upon application for acceptance to the Network, and thereafter upon request. The Selection Criteria will comply with any state regulatory requirements (which may differ depending on Dentist's state of licensure) and will be available to all participating dentists. Dentists may appeal any decision regarding selection or retention for the Network through United Concordia's appeal process.

b. Dentist represents and warrants that he/she is licensed to practice in the aforementioned State and that such license has not been suspended, revoked or limited within the past five (5) years. Dentist further represents and warrants that his/her employees and facilities are licensed to the extent required by State law and shall only provide those services to Members as defined within the scope of their respective licenses. All of Dentist's rights and United Concordia's obligations under this Agreement are conditioned upon Dentist's and his/her employees continued maintenance of such licensure with no restrictions. United Concordia may begin the process to terminate this Agreement immediately upon notice if Dentist's license is suspended, revoked or limited in any way or if Dentist's conduct may result in immediate injury or damage to the health/safety of any Member.

c. During the term of this agreement, the Dentist agrees to maintain professional liability insurance at: (a) the level required by any applicable state mandate, (b) $200,000 per occurrence and $600,000 for aggregate occurrences, or (c) other level acceptable to United Concordia, based on accepted standards in Dentist's geographic area and risk factors applicable to Dentist's practice.

d. Dentist agrees to accept communications from United Concordia via mail, facsimile or e-mail at the addresses/numbers shown on Dentist's Credentialing Application.

2. Dentist agrees to participate at all practice locations with all United Concordia Fee for Service Programs and in any other plan, program or arrangement for which United Concordia has agreed to provide access to the Network ("Network Access Arrangements"). Dentist specifically authorizes United Concordia to enter into Network Access Arrangements and agrees to provide services to Members enrolled under any Network Access Arrangement, subject to all of the terms and conditions of this Agreement. A listing of all currently effective Network Access Arrangements is available on United Concordia's web site, www.unitedconcordia.com. Dentist will comply with all policies and procedures governing the administration of United Concordia's Fee for Service Plans and all Network Access Arrangements, including but not limited to: claim submission, complaints, grievances, utilization review, and quality management, as set forth in the most current version Dental Reference Guide, as it may be amended from time to time. The most current version of the Dental Reference Guide will be available for review on United Concordia's web site, www.unitedconcordia.com.

3. Dentist agrees to report all covered services for eligible Members on a timely basis following the date the services were rendered using an ADA claim form or other form acceptable to United Concordia.

4. Dentist agrees to accept his/her charge or the United Concordia Maximum Allowable Charge, whichever is lower, as payment in full for covered services and to bill the Member only for applicable deductibles, coinsurance, or amounts exceeding contractual maximums. In agreeing to this provision, Dentist understands that the most current applicable versions of the Maximum Allowable Charge (MAC) schedules will apply to reimbursement for all covered services. The current schedule of Maximum Allowable Charges, and dental policies that may affect the manner in which such charges are billed and reimbursed, are available on United Concordia's web site, www.unitedconcordia.com.

5. Dentist may bill a Member for non-covered services (which are defined as any service for which no payment is made under the applicable plan or arrangement for any reason, including but not limited to, services in excess of contractual maximums, services not covered under plan design, and services denied due to contractual limitations). Dentist's charge to Member for non-covered services may not exceed the Maximum Allowable Charge for the applicable CDT code as specified in the most current Maximum Allowable Charge schedule. Fees for all non-covered services will be collected from the Member, and not billed to United Concordia.

6. Dentist agrees that the services provided and charges made to United Concordia Members shall be consistent with those to his/her other patients.

7. Dentist may not bill a Member for charges itemized and distinguished from the professional services provided, including but not limited to, office overhead expenses, fees for completing claim forms, OSHA compliance surcharges, or costs of submitting additional information to United Concordia.

8. The determination of whether any services performed by Dentist for a Member are covered by that Member's contract shall be made by United Concordia. Fees for covered services deemed not dentally necessary shall not be collected from the Member unless the Dentist informs the Member of his/her specific financial liability in writing and the Member chooses to receive the service. The Dentist should appropriately note such notification to the Member in the Dentist's records.

9. Dentist shall be responsible, at all times, for maintaining emergency coverage provided in accordance with the guidelines of the ADA or applicable state laws.

10. Dentist will maintain accurate and complete dental records for all Members enrolled in the Plan.

11. Dentist shall furnish any information deemed necessary by United Concordia to make determinations of coverage and shall permit United Concordia representatives to make reasonable examinations of his/her clinical records, including x-rays, relating to covered services when such examination is necessary to resolve any question concerning such services.

12. Dentist is not an employee of United Concordia, and United Concordia shall do nothing to interfere with the customary Dentist-patient relationship.

13. All personally identifiable information about United Concordia dental plan Members ("Protected Health Information") is subject to various privacy standards, including the regulations adopted by the Department of Health and Human Services under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 45 CFR Parts 160, 162 and 164, and various state statutes and regulations protecting individual privacy. The parties will use or disclose Protected Health Information received from the other only as permitted by such privacy standards, or to comply with judicial process or regulatory mandate.

(Continued)

14. Dentist shall indemnify and hold harmless United Concordia, those groups which have entered into contracts with United Concordia, and Members from any and all claims, liability, cost, damage or expense, for or as a result of any damage or loss occurring by reason of any failure by Dentist to comply with this Agreement, or as a result of any negligence, misfeasance, malfeasance or malpractice on the part of Dentist in performing services for Members.

15. United Concordia shall indemnify and hold harmless Dentist from any and all claims, liability, cost, damage or expense to the extent that such claims, liability, costs, damages, or expenses are solely caused by the negligence, misfeasance, malfeasance, nonfeasance on the part of United Concordia.

16. Dentist agrees not to discriminate in the treatment of Members as to the quality of service delivered because of race, sex, marital status, veteran status, age, religion, color, creed, sexual orientation, national origin, and disability, place of residence, health status or method of payment.

17. This agreement shall be effective only upon acceptance by United Concordia and shall continue in effect thereafter, until terminated by either party according to the following provisions:
   a. Either party may terminate this Agreement upon sixty (60) days prior written notice.
   b. United Concordia may terminate this Agreement immediately if Dentist fails to comply with the terms of this Agreement.
   c. United Concordia may terminate this Agreement if Dentist no longer meets the Selection Criteria.

18. This Agreement may be modified or amended by United Concordia upon written notice to Dentist. If Dentist fails to object to the amendment within thirty (30) days of its receipt, the amendment will be deemed approved by Dentist.

19. Dentist's contractual rights and responsibilities hereunder shall not be assigned or delegated without the prior written consent of United Concordia. This Agreement shall be assignable by United Concordia to a subsidiary, affiliate, or Successor Corporation.

20. The terms set forth in the attached DEPARTMENT OF DEFENSE ADDENDUM TO THE PARTICIPATING DENTIST AGREEMENT WITH UNITED CONCORDIA COMPANIES, INC. shall govern all services provided to members of dental programs offered by the Department of Defense.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date below.

To be completed by DENTIST:

Date: ______________________ Signature: ______________________

Provider No.: ______________________ Print Name: ______________________

SS No.: ______________________ Office Address: ______________________

Tax ID No.: ______________________ ______________________

NPI No.: ______________________ Telephone No.: ( ) ______________________

To be completed by UNITED CONCORDIA:

Date: March 27, 2009 Signature: [signature]

EACH PROVIDER IN PRACTICE SHOULD SIGN A SEPARATE AGREEMENT
***PLEASE ATTACH A COPY OF YOUR CURRENT DENTAL LICENSE***

UNITED CONCORDIA

# DEPARTMENT OF DEFENSE ADDENDUM TO THE PARTICIPATING DENTIST AGREEMENT WITH UNITED CONCORDIA COMPANIES, INC.

Effective August 1, 2009, all forms of the Participating Dentist Agreement with United Concordia Companies, Inc., (referred to herein as the "Agreement") are hereby amended by replacing the "TDP Addendum" effective February 1, 2006 with the following:

***The following terms and conditions will apply in all cases where covered services are provided to members of dental programs offered by the Department of Defense ("DoD") to certain military personnel and their eligible family members ("DoD Members"), such as the TRICARE Dental Program ("TDP") and the Active Duty Dental Program ("ADDP"). Wherever any term of this Addendum conflicts with a term of the Agreement, the terms of this Addendum shall prevail in cases where the patient is a DoD Member.***

1. Following exhaustion of any DoD Member's annual dental benefit maximum or lifetime orthodontic benefit maximum, Dentist will accept as payment in full for any additional services the Maximum Allowable Charges applicable to the Fee for Service Network. Payment for all services in excess of DoD maximums are collected from the patient

2. Upon request, Dentist will complete the DD Form 2813, Active duty/Reserve Forces Dental Examination Screening Form at no additional cost to the DoD Member.

3. Dentist will not attempt to collect payment from any DoD Member for any covered service that is denied as medically or dentally unnecessary or not meeting accepted standards of practice and the DoD Member will be held harmless from any financial liability, unless the DoD Member is informed by the Dentist in advance of receiving the service that the service is excluded or excludable from coverage, and the DoD Member agrees to pay for the service. Such agreement to pay by the DoD Member shall be evidenced in writing, either by written agreement or in clinical notes entered into the patient's clinical record contemporaneously with the time and date of agreement. The DoD Member's agreement to receive such services, without written evidence of the enrollee's agreement to pay notwithstanding exclusion from coverage, shall not constitute a waiver of the DoD Member's right to be held harmless.

4. Dentist will indemnify the Government with respect to any liability resulting from services provided to DoD Members.

5. Dentist will notify United Concordia if Dentist's practice is closed to new patients, or is reopening to new patients after having been closed.

# EXHIBIT C

# NETWORK ACCESS AGREEMENT

This NETWORK ACCESS AGREEMENT **("Agreement"),** effective as of July 1, 2016 (the "Effective Date") is entered into by and between Solstice Benefits, Inc., a Florida corporation and its Affiliates, (collectively **"Network User")** and United Concordia Companies, Inc., a Pennsylvania corporation and its Subsidiaries and Affiliates, **(collectively "Network Owner").** Network User and Network Owner are from time to time referred to herein individually as “Party” or collectively as “Parties”.

## RECITALS

**WHEREAS,** Network Owner is in the business of creating and maintaining networks of dentists who agree to provide services at predetermined fees to Eligible Participants and the business of providing certain dental administrative services;

**WHEREAS,** Network Owner has developed a dental care network named United Concordia Advantage Plus Dental Network (as defined in Sections 1.3 and 1.12 of this Agreement and hereinafter referred to as “Dental Network”); and

**WHEREAS,** Network Owner desires to make Dental Network available to Eligible Persons of Network User and for dental benefits administered or marketed by Network User; and

**WHEREAS,** Network User is a Florida corporation duly licensed as a Life and Health Insurer pursuant to Florida Insurance Code authorized to write Accident and Health, Prepaid Limited Health Service Organization, and Discount Medical Plan Organization lines of business as well as provide Third Party Administration; and

**WHEREAS,** Network User directly and through various of its Affiliates and/or Subsidiaries, is in the business of selling and administering insured dental coverage and Self-Funded Dental Coverage as well as creating and maintaining networks of dentists who agree to provide services at predetermined fees to Eligible Participants; and

**WHEREAS,** Network User desires to engage the services of Network Owner and Network Owner desires to establish a business relationship with Network User with regard to the offer of certain dental administrative services including providing Network User access to Dental Network subject to the terms, conditions and limitations stated therein.

**NOW, THEREFORE,** in consideration of the promises and mutual agreements herein, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

The following definitions apply for purposes of this Agreement:

**Section 1.1. Affiliate.** With respect to a Party to this Agreement, any person or entity that directly or indirectly controls the Party, is controlled by the Party, or is under common control with the Party, as of the Effective Date of the Agreement. For purposes of this Section 1.1 and Section 7.2.4, "control" means the possession of the direct or indirect power to direct or cause the direction of the management and policies of an entity, whether through (i) ownership of voting securities, membership interests or the like, (ii) contract, or (iii) otherwise. Without limiting the foregoing, ownership of more than fifty percent (50%) of the voting securities or membership interests of an entity constitutes control of such entity.

**Section 1.2. Business Day.** A day when the New York Stock Exchange is open for transactions.

**Section 1.3. Dental Network**. The United Concordia Advantage Plus Dental Network, as further defined in Section 1.12.

**Section 1.4. Eligible Participant.** Each natural person entitled to receive dental service benefits under an individual, group, association, or trust Network-Based Coverage plan offered by Network User and afforded network access pursuant to this Agreement.

**Section 1.5. Law.** Any federal, state, local, or other constitution, charter, act, statute, law, ordinance, code, rule, regulation, order, specified standards or objective criteria contained in any applicable permit or approval, or other legislative or administrative action of the United States of America, or any state or any agency, department, authority, political subdivision or other instrumentality thereof or a decree or judgment or order of a court.

**Section 1.6. Network-Based Coverage.** Any arrangement under which an Eligible Participant may receive services from any dentist on a fee for service basis that also provides financial incentives for receipt of services from dentists who are part of a dental network. This term does not include discount card arrangements or plans, prepaid dental coverage, or Medicaid.

**Section 1.7. Network Dentist.** A dentist who has been credentialed by or on behalf of Network Owner and who has entered into a written agreement with Network Owner to participate in the Dental Network.

**Section 1.8. Network User.** The Party that is accessing the Dental Network pursuant to this Agreement.

**Section 1.9. Non-Par Dentist.** A dentist who is not a Network Dentist.

**Section 1.10. Self-Funded Dental Coverage.** Dental coverage financed entirely by the plan sponsor and not insured.

**Section 1.12. United Concordia Advantage Plus Dental Network.** The network of dentists offered by Network Owner to its customers under direct contractual obligation to Network Owner to provide dental services on a Network-Based Coverage basis to Eligible Participants known as the United Concordia Advantage Plus Dental Network, as such network may be renamed by Network Owner from time to time, excluding any dentists who refuse to participate in such network with respect to this Agreement and

any dentists removed or not accepted by Network User in accordance with Section 3.7. The term "direct contractual obligation" shall not include any network made available to Network Owner through a network access or leasing arrangement with a third party.

## ARTICLE 2
## NETWORK OWNER DUTIES

### Section 2.1. Network Creation, Maintenance and Network User Access

**2.1.1. Network Areas.** Network Owner has created and maintains the Dental Network, a network of dentists who are practicing dentistry in various geographic areas ("Network Areas") and Network Owner agrees to make the services of its Network Dentists available to Eligible Participants in accordance with the terms of this Agreement. Network Owner intends to continue to recruit and maintain reasonable access to dentists. Network Owner may continue to recruit Non-Par Dentists subject to the terms of the Agreement, including, without limitation, Section 4.1 hereof, in and outside its Network Areas without restriction.

**2.1.2. Credentialing and Selection of Dentists.** Network Owner shall maintain credentialing, re-credentialing and peer review processes for its Network Dentists in accordance with applicable Laws and industry standards and with Network Owner's written policies and procedures. Network Owner represents that, for those Network Dentists who have elected to participate in Medicare Advantage, its Network Dentists have been credentialed and re-credentialed in accordance with standards applicable to Medicare Advantage business. Network Owner has disclosed to Network User the selection, credentialing and re-credentialing criteria and procedures used to select Network Dentists, which are in effect as of the date of this Agreement. Network Owner shall adhere to the terms of such criteria and procedures. Network Owner's selection and credentialing criteria or procedures shall be deemed Confidential Information as defined under Section 5.1 of this Agreement. Network Owner may delegate any of its credentialing duties hereunder to a third party credentialing verification organization. Network User shall reserve the right to audit Network Owner's credentialing and re-credentialing procedures. Network Owner shall provide Network User open access to all applicable files related to Network Owner's credentialing and re-credentialing procedures, including but not limited to applicable provider files if requested so that Network User can comply with all federal and/or state regulations including but not limited to federal and/or state agency audits or investigations. Any such audit shall be limited in frequency to not more than one in any 12 month period or as required in order for Network User to comply with audits and investigations of both federal and state regulatory agencies.

**2.1.3. Dentist Agreement**. Network Owner has provided Network User with a copy of its standard participating dentist agreement, which shall be in material compliance with applicable Law (including that applicable to Medicare Advantage business). Such agreement shall be deemed Confidential Information as defined under Section 5.1 of this Agreement. Network Owner shall adhere to the terms of its participating dentist agreements. Network Owner shall promptly disclose to

Network User any material changes to its standard participating dentist agreement.

**2.1.4. Services and Provider Fees.** Network Owner shall contract with Network Dentists to provide the following to Eligible Participants: (i) the same care and attention, appointment availability, and office facilities the dentists customarily provide to all of their other patients; (ii) dental care consistent with generally accepted standards of dental care; and (iii) predetermined fees payable to Network Dentists, which fees Network Owner may change from time to time. Network Owner represents and warrants that the network fees that Network Owner will make available for Eligible Participants pursuant to this Agreement are the same network fees that Network Owner makes available to its other network users' eligible participants for similar network offerings. Network Owner also represents and warrants that such network fees shall be established in such a manner to avoid incentives for Network Dentists to reduce or limit care to Eligible Participants.

**2.1.5. Exclusivity.** Network Owner shall not require Network Dentists to contract exclusively with Network Owner.

**Section 2.2. Administrative Support.**

**2.2.1. Network Dentists and Fees.** Network Owner shall promptly provide Network User with such information regarding Network Dentists and their approved fee schedules for Network Areas, in a mutually agreed upon electronic format, as may be reasonably necessary for directory, referral, and claims processing purposes. The information will include the name, services or specialties, taxpayer identification number, Network Fees, addresses, and telephone numbers of each Network Dentist, as well as any other mutually agreed upon available information needed for directory, referral, analytical or claims processing purposes. Network Owner shall update such information at least once monthly by the first Business Day of each month and shall promptly provide such updated information to Network User. Network owner shall provide forty-five (45) day notice to Network User of any material changes to Dental Network. Any updates to fee schedules shall be provided by Network Owner at least sixty (60) calendar days in advance of an effective date. Network Owner shall use best efforts to ensure that its network fee schedules are compliant with the version of CDT codes in effect at that time.

**2.2.2. Communication to Network Dentists.** Within the time period as agreed to by the parties, Network Owner shall, at its own cost, communicate to its Network Dentists appropriate information about the arrangement between Network Owner and Network User and about Eligible Participants' access to Network Dentists. The timing, frequency and content of such information are subject to prior written agreement of the Parties. A Network Dentist may refuse in writing, either at the inception of this Agreement or at any time during its term, to participate in the arrangement between Network Owner and Network User, provided that Network User receives adequate notice of such refusal to allow Network User to take reasonable steps to remove such Network Dentist from its provider directories and claims payment systems. Network Owner shall provide assistance to Network User in regards to any disputes with Network Dentists.

**Section 2.3. Compliance and Approvals.** In negotiating and contracting with Network Dentists and in operating its Dental Network, Network Owner shall operate in material compliance with all Laws applicable to its obligations under this Agreement, including, without limitation, applicable antitrust, privacy and security, confidentiality, and preferred provider Laws. Without limiting the foregoing, Network Owner shall obtain all governmental approvals or registrations necessary to operate a dental PPO network, or such other approvals or certifications as may be required in Network Area prior to offering Network User access to Dental Network in such Network Area for Eligible Participants, and shall maintain such approvals or registrations as required by Law. In addition, Network Owner shall notify Network User promptly if any such approval or notification is revoked, suspended, or materially restricted.

**Section 2.4. Network User Access**. Network Owner shall give Network User access to Dental Network in consideration for payment of the fees provided in Section 3.2 and subject to the conditions for and limitations on use as provided in Section 3.3.

## ARTICLE 3
## NETWORK USER'S DUTIES

**Section 3.1. Claims Processing and Payment.**

**3.1.1. Claims Administration.** Network User shall process and pay all claims in accordance with the terms of the applicable Eligible Participant contract.

**3.1.2 Compliance.** To the extent applicable, Network User shall act in material compliance with all claims processing and payment obligations imposed by Law.

**3.1.3. Network Dentist Fees.** Network User agrees to pay Network Dentists according to the Network Owner's proprietary fee schedule, and the terms and conditions of the Eligible Participant contract.

**3.1.4. Network Configuration.** Network Owner acknowledges that Network User may have access to other dentist networks, both affiliated and unaffiliated with Network User. Network User may create a “network stack” comprised of multiple networks. Network User shall place Dental Network no lower than second in priority among other networks that comprise its network stack. Network User shall notify Network Owner in writing of the relative priority of the Network Based coverage dental networks to which Network User has access: (i) prior to and upon the Effective Date of this Agreement, and (ii) within sixty (60) days following any change in the relative priority of such networks within its network stack or of the elimination of Dental Network from Network User’s network stack.

**3.1.5. Cooperation.** The Parties shall cooperate with each other to provide information and assistance to resolve disputes or issues with Eligible Participants or Network Dentists.

**<u>Section 3.2. Compensation.</u>**

**3.2.1. Access Fee**. Network User shall pay Network Owner an access fee ("Access Fee") when the applicable claims adjudication process of Network User utilizes the provider fee schedules of the Network Owner. [redacted]

[redacted]

**3.2.2 Payment of Access Fee**. [redacted]

**<u>Section 3.3. Obligations and Limitations Affecting Network User's Access to Dental Network.</u>** Network User shall utilize Dental Network only in accordance with the uses and limitations set forth in Section 3 of this Agreement. Network User may not use Dental Network in connection with any marketing arrangement, strategic partnership, joint venture,

fronting arrangement, reinsurance arrangement or similar arrangement other than as provided for in this Agreement.

**3.3.1. Network User's Access to Dental Network.** Network User may offer access to the Dental Network only to Eligible Participants enrolled in Network-Based Coverage: (i) insured or administered by Network User or (ii) insured or administered by Affiliates and/or Subsidiaries of Network User.

**3.3.2.** Network User is prohibited from sharing, leasing or otherwise making available Dental Network to any Party other than Network User and its Affiliates and/or Subsidiaries.

**Section 3.4. Use of Network Owner Logos and Trade Names.** Except as required by applicable Law or by the terms of this Agreement, without the prior written consent of Network Owner, which Network Owner may grant or withhold in its sole discretion, Network User shall not use any name, trade name, logo, trademark, or service mark of Network Owner or any of its Affiliates and/or Subsidiaries, or issue any press release or other announcement or disclosure pertaining to the negotiations or relationship between the parties. Network User shall be permitted to use Network Owner's name in connection with operational activities such as explanation of benefits, client lists and provider educational materials, subject to the prior written agreement of the Parties to the form and manner of such use. Network User shall include Network Owner's name on its member identification cards as the supplier of the network to which Eligible Participants have access, subject to prior review and approval by Network Owner.

**3.4.1. Network Marketing Names.** Subject to Section 3.5, Network User shall be permitted to develop and utilize a name or brand to refer to Dental Network for use in sales and marketing efforts of the Network User.

**Section 3.5. Compliance and Approvals.** Both Parties shall operate in material compliance with all applicable Laws, including, without limitation, applicable antitrust, privacy and security, confidentiality, and preferred provider Laws. Without limiting the foregoing, Network User shall obtain all governmental approvals or registrations necessary to offer a dental PPO network, or any other required approval prior to offering access to the Dental Network for Eligible Participants, and shall maintain such approvals or registrations as required by Law. In addition, Network User shall notify Network Owner promptly if any such approval or notification is revoked, suspended, or materially restricted. Network User shall oversee and monitor such aspects of network management as are required by applicable Law.

**Section 3.6. Compliance with Participating Dentist Agreement.** In accessing Dental Network, Network User shall use best efforts to comply with any terms of Network Owner's standard participating provider agreement that are applicable to Network User as a lessor of the Dental Network in the administration of its Network-Based Coverage plans.

**Section 3.7. Removal of Network Dentists.** Network User may elect not to accept any Network Dentist into, and may remove any Network Dentist from Dental Network at any time for any reason other than as prohibited by applicable Law or this Agreement.

**Section 3.8. Future Acquisitions.** If Network User, directly or through an Affiliate, acquires an additional health or dental entity, inclusion of Network-Based Coverage of such future acquisition under this Agreement may be permitted subject to Network Owner's agreement.

## ARTICLE 4
## NON-SOLICITATION AND EXCLUSIVITY

**Section 4.1. Provider Solicitation.** [redacted]

**Section 4.2. No Exclusivity.** Network Owner is free to make the services of Dental Network available to third parties.

**Section 4.2. Non-Solicitation of Network Owner's Incumbent Business.** Network User is prohibited from using Dental Network to solicit incumbent business of Network Owner or any of its Affiliates and/or Subsidiaries.

## ARTICLE 5
## CONFIDENTIALITY, PRIVACY AND SECURITY

**Section 5.1. Confidential Information.**

**5.1.1.** As used in this Agreement, "Confidential Information" shall mean any and all data and information relating to the business of the disclosing Party (the "Disclosing Party") which is disclosed to the other Party (the "Receiving Party") pursuant to this Agreement, including, but not limited to, information about hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, "know-home, compilations, market research, marketing techniques and plans, business plans and strategies, customer names and all other information related to customers, clients, policyholders, providers, or Eligible Participants, including without limitation any "nonpublic personal information" as defined under the Gramm-Leach-Bliley Act ("GLBA"), price lists, pricing policies, provider fees and other financial information or other business and/or technical information and materials, in oral, demonstrative, written, graphic or machine-readable form, which is unpublished, not available to the general public or trade, and which is maintained as confidential and proprietary information by the Disclosing Party for regulatory, customer relations, and/or competitive reasons. Confidential Information shall also include such confidential and proprietary information or material belonging to a Disclosing Party of or to which the other Party may obtain knowledge or access through or as a result of the

performance of its obligations under the Agreement. Confidential Information also includes any information described above which the Disclosing Party has obtained in confidence from another Party who treats it as proprietary or designates it as Confidential Information, whether owned to developed by the Disclosing Party. Confidential Information also includes the terms set forth in this Agreement, as well as the substance of negotiations between the Parties.

Confidential Information shall not include information which (a) is or becomes part of the public domain other than as a result of a disclosure by the Receiving Party in breach of this Agreement; (b) is rightfully known by the Receiving Party prior to disclosure by the Disclosing Party; (c) is furnished to others by the Disclosing Party without restriction on disclosure, (d) is independently developed by the Receiving Party at any time, without any breach of this Agreement; (e) is rightfully obtained by the Receiving Party from a source other than the Disclosing Party who the Receiving Party reasonably believes is not bound by a contractual, legal or fiduciary obligation of confidentiality to the Disclosing Party; (f) the Disclosing Party expressly agrees in writing does not constitute Confidential Information; or (g) is required to be disclosed by the Receiving Party by judicial or government action.

**5.1.2. <u>Disclosure and Use of Confidential Information.</u>**

**5.1.2.1.** The Receiving Party agrees to use the Disclosing Party's Confidential Information only for the purposes of fulfilling its obligations to the Disclosing Party and only for the purposes for which it was disclosed. Receiving Party further agrees not to disseminate, disclose, publish, transfer or otherwise make available Confidential Information to other third parties, without prior written approval from the Disclosing Party or as otherwise required by Law, unless such disclosure is necessary for Receiving Party to meet its contractual obligations and that Party is similarly bound by substantially the same confidentiality standards in the handling of the Confidential Information.

**5.1.2.2.** Receiving Party may disclose Confidential Information to its Affiliates, Subsidiaries, officers, directors, general partners, employees, agents, financial advisors or attorneys who are directly involved in Receiving Party meeting its contractual obligations and who have a specific need to know such information, and have obligated themselves to hold such Confidential Information in trust and confidence or otherwise comply with the terms of this Agreement.

**5.1.2.3. Disclosing** Party warrants that the disclosure of the Confidential Information to the Receiving Party is in accordance with applicable state and federal Law and the Disclosing Party's own stated privacy policies.

**5.1.2.4.** Receiving Party warrants that all Confidential Information relating to the Disclosing Party shall be held in confidence to the same extent and in at least the same manner Receiving Party protects its own confidential and proprietary information.

**5.1.2.5.** Without the prior written consent of Disclosing Party, which

Disclosing Party may grant or withhold in its sole discretion, Receiving Party shall not allow or enable any natural person located outside the United States of America to have access to any Confidential Information of Disclosing Party.

**5.1.2.6.** Receiving Party shall not make any more copies of Confidential Information than is necessary for its use under the terms of the Agreement and each such copy shall be marked with any such proprietary notices as appear on the originals.

**5.1.2.7.** Prior to any mandatory or compelled request for the disclosure of Confidential Information to any authorized governing body, the Receiving Party shall first attempt to notify the Disclosing Party to allow the Disclosing Party to try and seek a protective order protecting or limiting the disclosure of the Confidential Information, unless the notification is prohibited by the nature of the request or subpoena.

**5.1.2.8.** Upon expiration or termination of this Agreement, the Receiving Party shall, to the extent reasonably possible, promptly return to the Disclosing Party all of the Disclosing Party's proprietary information and all copies of such information. If such return is not reasonably possible, or if the Disclosing Party directs, the Receiving Party shall promptly destroy all such information, provided that such destruction is in accordance with applicable Law. If destruction is not reasonably possible, the Receiving Party shall so inform the Disclosing Party (along with a justification as to why destruction is not reasonably possible) and continue to hold all such proprietary information in confidence in accordance with Section 5.1.2, notwithstanding any termination of this Agreement.

**5.1.2.9.** This Section 5.1 is intended to protect the parties' proprietary rights and business relationships and any violation hereof would cause irreparable harm to the parties' business. Therefore, the parties agree that, in addition to the other remedies that may be available to a Party, a court of competent jurisdiction should immediately enjoin any breach of this Section 5.1 upon the request of the non-breaching Party.

**Section 5.2. Privacy and Security of Sensitive Personal Information**

**5.2.1.** For purposes of this Agreement "Sensitive Personal Information" means any and all data and information that Receiving Party received or derives in any manner pursuant to this Agreement which is related to prospective, former and existing customers, clients, insureds or employees of Disclosing Party. It includes but is not limited to the following: any individually identifiable information from or about an individual, any information that is combined with such individually identifiable information, including: 1) first and last name, social security number or other governmental issued number or identifier, date of birth, home or physical address, email address or other online contact information, telephone number, information that can be used to identify the person, such as passwords, PINs, biometric data, unique identification numbers, answers to security questions, credit card number, customer proprietary network information, financial account number, policy or certificate number, including any other information that either

alone or in combination with other data could provide information specific to a particular person, and/or: 2) all other information protected under applicable state or federal privacy or data security Laws, including but not limited to GLBA and Health Information Portability and Accountability Act of 1996 ("HIPAA"), including any applicable amendments thereto.

**5.2.2.** Receiving Party agrees, where legally required, to comply with all applicable privacy and security Laws, including, but not limited to: (a) HIPAA; (b) GLBA; (c) any and all applicable state privacy and security Laws; and (d) any relevant regulations promulgated in conjunction with applicable privacy and security Laws.

**5.2.3.** Each Party will ensure that the security provisions set forth herein apply to itself and to any authorized subcontractor under this Agreement (as authorized pursuant to Section 10.7 below). Any exceptions to the security provisions set forth shall require advance written approval by the other Party's Corporate Information Security Officer (or comparable official) and Corporate Privacy Officer which approval shall be documented in an amendment to this Agreement. If any Party is given access, whether on-site or through remote facilities, to any computer or electronic data storage system of another Party in order to provide or receive the services, the Party that receives such access shall limit such access and use solely to the provision or receipt of the services within the scope of this Agreement and shall not access or attempt to access any computer system, electronic file, software or other electronic services other than those specifically required to provide or receive such services. Under no circumstances shall either Party's employees access any networks or facilities of the other Party for the purpose of accessing other external networks (other than as permitted within the scope of the services), nor shall any such capabilities for such access be published or made known to unauthorized persons via any medium, as for example and not by way of limitation, posting on bulletin boards, social networks or e-mail. Neither Party shall use back doors, data capture routines, games, viruses, worms, Trojan horses, or SQL injections, and any intentional introduction of such into the other Party's data networks shall be deemed a material breach of this Agreement.

**5.2.4.** The Party receiving access shall limit such access to those of its employees who have need for such access in connection with the services and shall follow all security rules and procedures for use of the providing Party's electronic resources of which it receives written notice. All user identification names and numbers and passwords and any information obtained as a result of access to and use of a Party's computer and electronic data storage systems shall be deemed to be, and shall be treated as, Sensitive Personal Information under applicable provisions of this Agreement. Each Party agrees to cooperate with the others in the investigation of any apparent unauthorized access to a Party's computer or electronic data storage systems.

**5.2.5.** Either Party shall have the right to immediately take any reasonable action to protect itself against any improper act that threatens such Party's networks or infrastructure, including, but not limited to, the right to temporarily restrict access, or at Party's reasonable discretion, the right to temporarily suspend the affected services until the problem has been resolved, without being held in breach of this Agreement or breach of any service level; provided, however, that such Party shall impose the least disruptive

restrictions on or suspensions of services as are available to implement the required protections.

**5.2.6.** Receiving Party agrees to cooperate fully with Disclosing Party to ensure its privacy and security compliance, including reasonable cooperation with Disclosing Party in its efforts to assess security procedures, including, but not limited to, assisting with assessments, questionnaires and/or audits. Upon written request, Receiving Party shall provide to Disclosing Party information, such as audits of summaries of test results, demonstrating the effectiveness of its privacy and/or security programs. During regular business hours but no more frequently than once a year and upon not less than thirty (30) days' prior notice, Disclosing Party may, at its sole expense, audit, test or inspect on-site Receiving Party's security program as it relates to this Agreement to ensure that Disclosing Party's data and Sensitive Personal Information is adequately protected and to ensure that Receiving Party is in compliance with the provisions of this Agreement. Disclosing Party shall provide a summary report of the audit results to Receiving Party along with a remediation plan, where necessary.

**5.2.7.** Each Party and its authorized subcontractors shall, at a minimum, implement and maintain the following procedures designed to protect the security of the other Party's Sensitive Personal Information as defined below:

a. Employ administrative, physical and technical safeguards that prevent the unauthorized collection, access, disclosure, and use of Sensitive Personal Information. Without limiting the foregoing, each Party must (1) use at minimum best industry practices to safeguard Sensitive Personal Information whether "at rest" or in transport, (2) encrypt or mask all Sensitive Personal Information in transport, (3) ensure that only its employees, representatives, agents, contractors, and subcontractors who have a need to know such information may access it, and only if those individuals comply with the obligations that are no less stringent than the obligations in this Agreement.

b. Maintain servers, databases, and other hardware and/or software components that store information related to business activities covered by the Agreement in an access controlled and consistently monitored data center secured by appropriate alarm systems.

c. Employees utilizing the desktop computing environment are prohibited from transmitting Sensitive Personal Information to unencrypted: personal computing devices, USB drives, cameras (or cameras that are integrated into phones), and any other device that would allow the capturing, printing or storing of the other Party's Sensitive Personal Information to be transported outside the secure facilities.

d. Employ user identification and access controls designed to limit access to Sensitive Personal Information to authorized user.

e. In the production environment, neither protected health information, as defined in 45 C.F.R. § 160.103 ("PHI"), nor taxpayer identification numbers may be stored, sent or accessed outside of the United States, including storage via server

storage, backup, printing, photography, copy, paste or similar, unless otherwise permitted in this Agreement. Whenever access to data is required for support, maintenance or other non-production services, any taxpayer identification numbers and PHI will be masked so as to be unreadable from non-United States locations.

f. Provide appropriate security controls to all external connections to the World Wide Web, including industry standard intrusion detection and countermeasures that will detect and terminate any unauthorized activity prior to entering the firewall maintained by the Party.

g. Employ industry standard firewalls regulating all Sensitive Personal Information entering the Party's internal data network from any external source which will enforce secure connections between internal and external systems and will permit only specific types of data to pass through; industry standard encryption techniques will be used when another Party's Sensitive Personal Information is transmitted by or on behalf of such other Party.

h. Transmitted Personal Information shall be encrypted over public networks and portable devices shall be encrypted such as laptops.

i. Have security protections across production and test environments.

j. Perform at minimum annual penetration testing.

k. Authentication shall at minimum require complex passwords to access Sensitive Personal Information inside a secure working environment.

l. Maintain and follow a disaster recovery plan designed to maintain access to the application and services, and to prevent the unintended destruction of Sensitive Personal Information, which plan, unless otherwise specified herein, shall provide for daily back-up of Sensitive Personal Information and archival of such Sensitive Personal Information at a secure facility.

m. Ensure that all necessary employees have passed background checks and that their access to systems hosting Sensitive Personal Information is limited to the minimum necessary.

n. Where applicable, have regular employee training regarding the security and data recovery programs.

o. Have audit controls that record and monitor systems activity continuously.

p. Whenever any activity under this Agreement would cause one Party to access the systems of another Party to perform the services, neither Party's employees shall use the other Party's computer equipment to perform the services if required to connect locally or remotely to the necessary systems. The Party shall supply computer equipment to the other Party's employees to

enable connection to that Party's systems and performance of the services when onsite. Such computer equipment shall be returned in fully useable condition (less normal wear and tear) immediately upon completion of the services. The other Party shall comply with all policies and procedures for the use of the computer equipment supplied, which shall be provided in writing. Any exception to these requirements shall require advance written approval by the Party's Corporate Information Security Officer (or comparable official) and Corporate Privacy Officer. In the event an exception is granted, the Party reserves the right to scan equipment for vulnerabilities to systems. If one Party is performing services for the other Party remotely, the Party remoting in will use an approved remote access method for connectivity to systems for support.

**Section 5.3. Security Notification.** In the event one Party reasonably believes that there is any improper, unauthorized or unlawful access to, use of, or disclosure or other compromise of Sensitive Personal Information ("Security Incident"), the Party where the Security Incident occurred shall immediately, or as soon as is practicable, notify the other Party in writing of the Security Incident. The Parties agree to work together to investigate and resolve all data privacy or security issues involving Sensitive Personal Information, including any Security Incident and/or notifications related thereto. The Party where the Security Incident occurred shall be responsible for all costs related to or arising from any Security incident, including investigating the Security Incident and providing notification to all individuals affected by the Security Incident. The provision of such notifications, if any, shall be solely at the discretion and direction of Party whose Sensitive Personal Information was involved in the Security Incident.

**Section 5.4. HIPAA Compliance.** If and when Network Owner performs functions that make it the Business Associate of the other, as provided under the standards for privacy of individually identifiable health information at 45 CFR Part 160, and Part 164, subparts A and E, as may be amended from time to time, Network Owner will comply with the Business Associate Addendum ("BAA") attached to this Agreement as Exhibit A.. Unless otherwise specified in this Agreement, all capitalized terms used in this Article 5 or the BAA and not otherwise defined herein have the meaning established for purposes of the Privacy Rule and the Security Rule under HIPAA, as amended from time to time.

## ARTICLE 6
## INDEMNIFICATION

Unless otherwise specified in this Agreement, each Party agrees to indemnify and hold the other Party, and its directors, officers, agents and employees harmless from any and all claims, liabilities, damages, demands, costs, losses, expenses (including reasonable attorney's fees and costs), or judgments asserted against, imposed upon, or incurred by the other Party that arise out of any intentional misconduct or acts or omissions on the part of the other Party, or its directors, officers, agents and employees, in performing or failing to perform as required by this Agreement.

**ARTICLE 7**
**TERM AND TERMINATION**

**Section 7.1. Term,** [redacted]

**Section 7.2. Termination.** A Party may terminate this Agreement only as provided in Section 7 of this Agreement:

**7.2.1. Termination Without Cause.** [redacted]

**7.2.2. For-Cause Termination.** [redacted]

**7.2.3. Immediate Termination.** Any of the following events may result in the immediate termination of this Agreement by either Party, upon written notice to the other Party specifically identifying the basis for such termination: (a) loss or limitation of the non-noticing Party's insurance coverage as required under this Agreement; (b) suspension, withdrawal, expiration, non-renewal or revocation of any federal, state, local or accrediting body license, certificate, registration, approval or authorization, that materially affects the non-noticing Party's ability to fulfill its obligations under this Agreement or to offer or administer dental plans; (c) the suspension or debarment of the non-noticing Party from participation in any government sponsored program; (d) a filing in bankruptcy, the appointment of a receiver, the marshaling of debts or assets, or the proposed settlement of outstanding debts under applicable reorganization or insolvency Laws filed by or against the non-noticing Party.

**7.2.4. Termination for Change of Control.** Network Owner may terminate this Agreement in the event of a Change in Control of Network User provided that the Change in Control is not to any Affiliate of Network User. Network User may terminate this Agreement in the event of a Change in Control of Network Owner provided that the Change in Control is not to any Affiliate of Network Owner. The Party that is undergoing the Change in Control shall notify the other Party as much as is practicable in advance of the proposed effective date of such Change in Control. The Party receiving such notice shall have ten (10) Business Days to determine if it intends to exercise the right of termination as provided for in this Section 7.2.4. Any such termination shall be effective upon the effective date of the

Change in Control or as otherwise agreed to by the Parties. For purposes of this Agreement, "Change of Control" means, with respect to Network Owner or Network User, any acquisition (as of the effective date thereof) by any person or group of persons, either directly or indirectly, of (a) the power to elect, appoint or cause the election or appointment of at least a majority of the members of the board of directors of such Party (or any other person to which all or substantially all of the properties and assets of such Party have been transferred), through beneficial ownership of the capital stock of such Party (or such other person) or through contract, agreement, arrangement or proxy, or (b) all or substantially all of the properties and assets of such Party.

**7.2.5. Run-Out After Termination.** Upon termination of this Agreement for any reason (other than as specified in the next sentence), the network access afforded a Network User by a Network Owner shall continue for one (1) year after the termination date. This provision shall not apply if the reason for termination of the Agreement is (i) for cause under Section 7.2.2 where cause is attributable to a Network User or (ii) the operation of the immediate termination provision of Section 7.2.3, other than termination under Section 7.2.3(a). For avoidance of doubt, the run-out after termination provision provided for under this Section 7.2.5 shall apply if termination of this Agreement is pursuant to Section 7.2.3(a).

## ARTICLE 8
## RELATIONSHIP GOVERNANCE AND DISPUTE RESOLUTION

**Section 8.1. Authorized Representatives.** Both Network Owner and Network User shall designate and authorize an individual (that Party's "Authorized Representative"), who shall be primarily responsible for arranging for and overseeing the performance of the obligations of the Parties under this Agreement. A Party may designate a replacement Authorized Representative during the term of this Agreement upon written notice to the other Party.

**Section 8.2. Notice and Submission of Disputes Unresolved by the Parties.** If the Parties cannot resolve the dispute, then each Party has the right to submit it to arbitration in accordance with procedures set forth in Section 8 of this Agreement.

**Section 8.3. Arbitration.** If the Parties cannot mutually resolve, pursuant to the process described in Sections 8.1 and 8.2, above, a dispute that arises out of or relates to this Agreement, the dispute will be decided through arbitration as a precedent to any right of action hereunder. To initiate arbitration, either Party will give the other Party notice of its desire to arbitrate, stating the nature of its dispute and the remedy sought. The Party to which the notice is sent will respond to the notice by giving the initiating Party notice of response within fifteen (15) Business Days of receipt of the initiating notice.

There will be three arbitrators who will be current or former officers of health or dental insurance companies other than the parties to this Agreement or their Affiliates and/or Subsidiaries. Each of the Parties will appoint one of the arbitrators and these two arbitrators will select the third. If either Party refuses or neglects to appoint an arbitrator

within sixty (60) Business Days of the initiation of the arbitration, the other Party may appoint the second arbitrator. If the two arbitrators do not agree on a third arbitrator within thirty (30) Business Days of the appointment of the second arbitrator, then the Parties will each name three candidates to serve as the third arbitrator. Beginning with the Party that did not initiate the arbitration, each Party will eliminate one candidate from the six until one remains. If this candidate declines to serve as the arbitrator, then the candidate last eliminated will be approached to serve. This process will be repeated until a candidate has agreed to serve as the third arbitrator.

Once chosen, the arbitrators are empowered to select the site of the arbitration and decide all substantive and procedural issues by a majority of votes. As soon as possible, the arbitrators will establish arbitration procedures as warranted by the facts and issues of the particular case. The arbitrators will have the power to determine all procedural rules of the arbitration, including but not limited to inspection of documents, examination of witnesses and any other matter relating to the conduct of the arbitration. The arbitrators may consider any relevant evidence and will weigh the evidence and consider any objections. Each Party may examine any witnesses who testify at the arbitration hearing.

The arbitrators will base their decision on the terms and conditions of this Agreement in the context of the customs and practices of the health insurance industries rather than on strict interpretation of the Law. The decision of the arbitrators will be made by majority rule and will be submitted in writing. The decision will be final and binding on both Parties and there will be no appeal from the decision. Either Party to the arbitration may petition any court having jurisdiction over the Parties to reduce the decision to judgment.

Unless the arbitrators decide otherwise, each Party will bear the expense of its own arbitration activities, including its appointed arbitrator and any outside attorney and witness fees. The Parties will jointly and equally bear the expense of the third arbitrator and other costs of the arbitration.

**Section 8.4. Injunctive Relief.** Notwithstanding the foregoing provisions of Article 8.3, either Party may seek, without having to conform to the process described in Article 8.3, a temporary or preliminary injunction, attachment or other provisional or interim relief when and as necessary to protect its rights. Despite such action, the Parties will continue to participate in the foregoing dispute resolution process.

**Section 8.5. Confidential Treatment of Settlement Offers.** Any written or oral statement or offers of settlement made in the course of the dispute resolution process shall: (a) be Confidential Information of both Parties; (b) not be offered into evidence, disclosed, or used for any purpose other than the dispute resolution process set forth in this Section 8; and (c) not constitute an admission or waiver of rights by either Party. Each Party shall promptly return to the other Party, upon request, any written statements or offers of settlement, including all copies thereof.

**Section 8.6. Performance of Obligations.** Each Party acknowledges that the timely and complete performance of their respective obligations pursuant to this

Agreement is critical to the business and operations of the other. Accordingly, in the event of a dispute between Network Owner and Network User: (a) each Party shall continue to so perform its obligations under this Agreement in good faith during the resolution of such dispute, unless and until this Agreement is terminated in accordance with the provisions hereof; and (b) each Party shall continue to pay any undisputed amounts until such termination.

**Section 8.7. Termination.** The terms of this Article 8 shall survive expiration or termination of this Agreement.

## ARTICLE 9
## RELATIONSHIP

**Section 9.1. Independent Contractors.** [redacted]

**Section 9.2. Practice of Dentistry.** It is expressly understood that neither Party to this Agreement is a provider of dental care services in connection with the services provided under this Agreement. Network Owner has entered into contractual arrangements with providers of dental care services, which providers are entities and contractors wholly independent of Network Owner and are not the employees, agents or representatives of Network Owner for any purposes. Network Owner is not responsible for the acts, omissions, representations or other conduct of any such provider of dental care services and such providers will be solely and exclusively responsible for the quality and level or frequency of dental services provided. This Agreement does not create any liability on the part of Network Owner for payments on dental claims for services provided to Eligible Participants by Network Dentists pursuant to this Agreement.

No Party shall interfere or intervene in any manner in the diagnosis or treatment rendered by a Network Dentist to an Eligible Participant or with any communication between a Network Dentist and an Eligible Participant. Benefit determinations by the claims administrator or payor shall not constitute interference or intervention.

**Section 9.3. Payment of Taxes.** Each Party shall be liable and responsible for its own local, state, or federal taxes arising from this Agreement, including, but not limited to, any sales tax, use tax, premium tax, and interest and penalties.

**<u>Section 9.4. Insurance.</u>** Each party shall at its sole cost and expense procure and maintain throughout the term of this Agreement such policies of comprehensive general liability and other insurance as shall be necessary to insure itself and its officers, directors, agents and employees against liability arising out of the performance of its responsibilities under this Agreement. Evidence of each Party's insurance policies shall be submitted to the other Party upon the other Party's written request. By specifying insurance herein, no Party represents that the coverage and limits will necessarily be adequate to protect the other Party, and such coverage and limits will not be deemed to be a limitation on the indemnities granted in this Agreement. Each Party will maintain, or cause to be maintained, at its expense, a fidelity bond with a limit of at least One Million Dollars ($1,000,000) covering losses caused by any dishonesty of its officers, employees or agents, as well as loss or destruction of money or other property belonging to others and held by such Party, with respect to performance of its responsibilities hereunder, until such time as all Parties agree in writing that all responsibilities of such Party hereunder are fully discharged.

**<u>Section 9.5. Cooperation.</u>** Each Party shall provide reasonable cooperation, including providing necessary information as permitted by Law, to enable the Parties to fulfill their respective compliance obligations under this Agreement, including, where applicable, obligations relating to oversight, reporting, and corrective actions.

**<u>Section 9.6. Affirmative Action.</u>** One or more of the Parties may be Equal Opportunity Employers which maintain an Affirmative Action Program. The other Parties may not currently be Parties to any contract that would render any of them subject to Executive Order 11246. However, to the extent applicable to such Parties, such Parties agree to comply with the following, as amended from time to time: Executive Order 11246, the Vietnam Era Veterans Readjustment Rehabilitation Act of 1973, any similar legislation regarding transactions relating to any government contract of an Equal Opportunity Employer, and any rules and regulations promulgated under such Laws.

**Section 9.7. Grievance Procedures.** Network Owner has established and shall maintain lawful grievance and appeal procedures for handling complaints and grievances. Within three business day of receipt, Network User shall refer to Network Owner all complaints, concerns or questions relating to the delivery of services by a Network Dentist or contractual obligations of the Network Owner. Network Owner shall comply with its grievance and appeal procedures, shall use best efforts to resolve such matters, and shall notify Network User of the outcome. If the complaint is not resolved to Network User's satisfaction, Network User may elect to place the Network Dentist on "current patient only" status and Network Owner shall not thereafter be required to refer new Eligible Participants to that dentist. In addition to the foregoing, Network User may remove a UCCI Network Dentist from the dental network offered by Network User in accordance with Section 3.7.

Network User has established and shall maintain lawful grievance and appeal procedures for handling complaints and grievances. Within three business days of receipt, Network Owner shall refer to Network User all complaints, concerns or questions relating to coverage, benefits or claims. Network User shall comply with its grievance

and appeal procedures to resolve such matters in accordance with the applicable dental benefits plan provisions and applicable law.

At the request of the Party responsible for handling a complaint or grievance, the other Party shall cooperate with the applicable procedures and shall provide, in a timely manner as necessitated or dictated by Law or applicable request of a regulator, all relevant information in its possession that it may lawfully provide and that is reasonably necessary to properly handle and resolve the complaint or grievance.

**ARTICLE 10**
**MISCELLANEOUS**

**Section 10.1. Books and Records.** [redacted]

**Section 10.2. Auditing.** [redacted]

**Section 10.3. Notices.** Except as noted, all notices and consents required or permitted to be given under this Agreement will be in writing and will be deemed to have been duly given if and when delivered personally, or when received if transmitted by first-class certified mail, return receipt requested, postage prepaid, email that provides verification of receipt, or if sent by a nationally recognized express courier service, postage delivery charges prepaid, or if sent by facsimile (but only if confirmed with a copy of the notice or consent sent by one of the other methods specified in this Section 10), as follows to:

| | |
|---|---|
| United Concordia Companies, Inc.: | United Concordia Companies, Inc.<br>4401 Deer Path Road<br>Harrisburg, PA 17110<br>Attention: President and COO<br>Fax: 717-260-7550 |
| with copies to: | Highmark Inc.<br>Law Department, 1B457<br>1800 Center Street<br>Camp Hill, PA 17011<br>Attention: Richard Enterline, Esquire<br>Fax: 717-302-4203<br>Richard.enterline@highmark.com |
| | John Doyle, Vice President, Strategic Partnership Sales<br>United Concordia Companies, Inc.<br>4401 Deer Path Road<br>Harrisburg, PA 17110 |
| Solstice Benefits, Inc.: | Solstice Benefits, Inc.<br>7901 SW 6th Court, Suite 400<br>Plantation, FL 33324<br>Attention: Legal |

**Section 10.4. Representations and Warranties.** Each Party represents and warrants that it is duly organized, validly existing and in good standing under the Laws where it is formed and does business and has full right, power and authority to enter into this Agreement and perform its obligations hereunder, and that this Agreement will be enforceable against it according to its terms subject only to Laws of bankruptcy and insolvency. Each Party also represents and warrants that the execution of this Agreement and the performance by it hereunder will not infringe upon the right of any third party or violate the provisions of any other agreement to which such Party is bound.

Each Party further represents and warrants that all governmental approvals, if any, have been obtained to permit its execution and delivery of and performance under this Agreement, there is no outstanding contract, commitment or arrangement and no pending or, to its knowledge, threatened litigation which may conflict with this Agreement or such Party's performance hereunder or which may in any way limit, restrict, impair or interfere with another Party's rights hereunder, and that it will comply with all applicable Laws in connection herewith.

**10.4.1. Debarment and Related Provisions.** Network Owner certifies that neither it nor its employees or subcontractors have been: (i) to the best of its knowledge and belief, charged with a criminal offense in connection with obtaining, attempting to obtain, or performing of a public (federal, state or local) contract or subcontract; (ii) listed by a federal governmental agency as debarred; (iii) suspended or otherwise excluded from federal program participation. Furthermore, Network Owner certifies that neither it nor its directors or officers or subcontractors have been convicted of or had a civil judgment rendered against them regarding dishonesty or breach of trust, including but not limited to, the commission of a fraud including mail fraud or false representations, violation of a fiduciary relationship, violation of federal or state antitrust statutes, securities offenses, embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen property; or within a three (3) year period preceding the date of this Agreement, had one or more public contracts (federal, state or local) terminated for cause or default. Network Owner also acknowledges and agrees that it has a continuing obligation to notify the Vice President of Compliance Operations at HCSC at 300 E. Randolph St., Chicago, Illinois 60601, in writing within seven (7) Business Days if any of the above-referenced representations change. Network Owner further acknowledges and agrees that any misrepresentation of its status or any change in its status at any time during the term of this Agreement may be grounds for immediate termination of this Agreement, at the sole discretion of Network User.

**Section 10.5. Entire Understanding.** This Agreement states the entire understanding by and among the Parties with respect to the subject matter hereof, and supersedes all earlier and contemporaneous oral and written communications and agreements or promises made with respect to the same subject matter, and any other previous agreements, promises or representations of any kind respecting the relationship by and among the Parties hereto.

**Section 10.6. Assignment.** A Party to this Agreement may not assign its duties and obligations under this Agreement to any other individual or entity without the prior written consent of the other Party. Notwithstanding the foregoing, the Parties agree that either Party may assign its rights or delegate its duties under this Agreement to one or more of its Affiliates and/or Subsidiaries; provided, however, that, any such assignment or delegation will not relieve the assigning Party of its obligations under this Agreement or release it from any responsibility or liability arising under this Agreement.

**Section 10.7. Subcontracting.** No Party may use a subcontractor to perform services under this Agreement unless it obtains the other Party's prior written consent;

provided, however that a Party may utilize an Affiliate of such Party as a subcontractor without such consent. For avoidance of doubt, vendors used by Network Owner to perform credentialing functions are not subcontractors as to Network Owner and the provider data management and web portal management vendors to Network User are not subcontractors for purposes of this Agreement. The use of a subcontractor by a Party to perform its obligations under this Agreement shall not relieve such Party of such obligations nor shall it release such Party from any responsibility or liability arising under this Agreement.

**Section 10.8. Nonwaiver.** No failure to exercise, delay in exercising, or single or partial exercise of any right, power or remedy by a Party will constitute a waiver of, or will preclude any other or further exercise of, the same or any other right, power or remedy.

**Section 10.9. Severability.** If any provision of this Agreement is construed to be invalid, illegal or unenforceable, then the remaining provisions of this Agreement will not be affected thereby and will be enforceable without regard thereto.

**Section 10.10. Regulatory Compliance Amendments**. If any provision of this Agreement is held to be illegal or otherwise to conflict with any present or future insurance, banking or other financial Law, the Parties will use commercially reasonable efforts to amend the Agreement to eliminate the conflict or illegality.

**Section 10.11. Survival**. The provisions of Article 5 (Confidentiality and Security), Article 6 (Indemnification), Section 7.2.5. (Run-Out After Termination), Article 8 (Dispute Resolution), Section 10.14 (Applicable Law), and this Section 10.11 (Survival) shall survive any expiration or termination of this Agreement.

**Section 10.12. Drafting of the Agreement**. Should any provision of this Agreement require judicial interpretation, the Parties agree and stipulate that the court interpreting or considering this Agreement will not apply any presumption that the terms of this Agreement will be more strictly construed against a Party who itself or through its agents prepared this Agreement. The Parties acknowledge that each Party hereto has participated in the preparation of this Agreement, either through drafting or review, and that each Party has had full opportunity to consult legal counsel of choice before execution of this Agreement.

**Section 10.13. Modification**. This Agreement may be amended by written amendments properly executed by the Parties hereto.

**Section 10.14. Applicable Law**. This Agreement will be construed and enforced according to the Laws of the State of Delaware without regard to the principles of conflicts of Laws of that state or any other state.

**Section 10.15. Headings**. Headings used herein are not a part of this Agreement and will not affect the terms hereof.

**Section 10.16. Counterparts**. This Agreement may be executed in any number of counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

**Section 10.17. Full Power and Authority**. The Parties to this Agreement represent and warrant that the signatory has full authority to bind the Party to this Agreement represented by the signatory and that the Party has full authority to enter into this Agreement and be bound by the terms and conditions of this Agreement.

**IN WITNESS WHEREOF,** the Parties have signed this Agreement, effective as of July 1, 2016.

**SOLSTICE BENEFITS, INC.**

By: ______________________________

Name: Carlos Ferrera
(Please print)

Title: Chief Operating Officer (COO)

**UNITED CONCORDIA COMPANIES, INC.**

By: ______________________________

Name: JOHN DOYLE
(Please print)

Title: VP, Strategic Partnerships

**Exhibit A**

**BUSINESS ASSOCIATE ADDENDUM**

This Business Associate Addendum ("Addendum"), effective as of the Effective Date of the Network Access Agreement to which it is an Exhibit ("Effective Date"), is entered into by and among Solstice Benefits, Inc. ("Solstice") and United Concordia Companies, Inc. ("UCCI"). Solstice is referred to as either "SOLSTICE" or "Covered Entity", as applicable. United Concordia Companies, Inc. is referred to as either "Business Associate" or "UCCI", as applicable.

WHEREAS, the Parties have entered into a Network Access Agreement bearing even date herewith, under which UCCI may be required to use and/or disclose SOLSTICE's Protected Health Information ("PHI") in the performance of certain services arising from the Network Access Agreement ("Services"), which activities may cause UCCI to be deemed a Business Associate of SOLSTICE functioning as a Covered Entity, depending on the context or circumstances of the Services;

WHEREAS, all Parties are committed to complying with all laws that regulate the use and disclosure of PHI, including but not limited to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and applicable state laws;

WHEREAS, UCCI, functioning as Business Associate acknowledges that with the enactment of the American Recovery and Reinvestment Act of 2009, Title XIII, Subtitle D (Pub. L. No 111-5 (2009)) (HITECH), certain provisions of HIPAA were amended in a way that directly impacts and regulates the Business Associate's responsibilities, obligations, and activities under the Privacy and Security Rules (defined below); and

WHEREAS, this Addendum sets forth the terms and conditions pursuant to which PHI that is provided by, or created or received by UCCI, acting as Business Associate of Covered Entity, will be handled between the Parties and with third parties during the term of the Network Access Agreement and after its termination.

NOW, THEREFORE, the Parties agree as follows:

**1. PERMITTED USES AND DISCLOSURES OF PROTECTED HEALTH INFORMATION**

1.1 Services. Business Associate provides certain Services that may involve the use and/or disclosure of PHI. Except as otherwise specified herein, the Business Associate may make any and all uses of PHI necessary to perform its obligations under the Network Access Agreement. All other uses not authorized by this Addendum are prohibited. Moreover, Business Associate may disclose PHI for the purposes authorized by this Addendum only:

(i) to its employees, subcontractors and agents, in accordance with Section 2.1(e) of this Addendum,

(ii) as directed by Covered Entity, or

(iii) as otherwise permitted by the terms of this Addendum including, but not limited to, Section 1.2 below.

1.2 Business Activities of the Business Associate. Except as otherwise limited in this Addendum:

(a) Business Associate may use PHI for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(b) Business Associate may disclose PHI for the proper management and administration of the Business Associate, provided that disclosures are required or permitted by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as required or permitted by law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

1.3 Additional Activities of Business Associate. In addition to using the PHI to perform the Services set forth in Section 1.1 of this Addendum, Business Associate may de-identify any and all PHI provided that the de-identification conforms to the requirements of 45 C.F.R. § 164.514(b), and further provided that Covered Entity maintains the documentation required by 45 C.F.R. § 164.514(b) which may be in the form of a written assurance from the Business Associate. Pursuant to 45 C.F.R. § 164.502(d)(2), de-identified information does not constitute PHI and is not subject to the terms of this Addendum.

## 2. RESPONSIBILITIES OF THE PARTIES WITH RESPECT TO PROTECTED HEALTH INFORMATION

2.1 Responsibilities of the Business Associate. With regard to its use and/or disclosure of PHI, the Business Associate hereby agrees to do the following:

(a) not use or further disclose PHI other than as permitted or required by this Addendum or as required or permitted by law.

(b) Business Associate agrees to use reasonable and appropriate efforts to implement and maintain the privacy and security of PHI and to prevent unauthorized use, disclosure, damage, or destruction of PHI. Business Associate agrees to implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of PHI that it creates, receives, maintains, transmits or destroys on behalf of Covered Entity consistent with the Security Rule and any subsequent amendments, including but not limited to HITECH,

Section 13401. Such efforts shall also include the adoption and enforcement of policies and procedures to reasonably and appropriately implement the requirements of the Privacy Rule and the Security Rule.

(c) to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of the requirements of this Addendum.

(d) to promptly (within five (5) business days of discovery as defined in HITECH, Section 13402), report to the designated Privacy Officer of the Covered Entity any Breach of PHI (as defined in 45 C.F.R. § 164.402) by Business Associate, its agents and subcontractors, or any successful Security Incident (as defined in 45 C.F.R. § 164. 302) that threatens the integrity or security of Covered Entity's PHI, and to the greatest extent possible, mitigate any harmful effect that is created by any Breach or Security Incident. Business Associate also agrees to assist in Covered Entity's notification of the occurrence to all necessary parties as required by law, regulation or as reasonably determined necessary by Covered Entity. To the extent that the Security Incident, Breach, or other unauthorized use, disclosure, damage or destruction of PHI occurs while the PHI is in the possession of the Business Associate and/or its agents or representatives, due to the acts or omissions of Business Associate, Business Associate will be responsible for all costs incurred in investigating and providing notification of the Security Incident, Breach, or other unauthorized use, disclosure, damage or destruction to the extent required by law.

Any such report shall include the identification (if known) of each individual whose Unsecured Protected Health Information has been, or is reasonably believed by Business Associate to have been, accessed, acquired or disclosed. Business Associate shall make the report to Covered Entity's Privacy Official not more than five (5) business days after Business Associate learns of such non-permitted use or disclosure. Business Associate's report shall at least:

a. Identify the nature of the non-permitted access, use or disclosure, including the date of the event and the date of discovery of the event;

b. Identify Protected Health Information accessed, used or disclosed (e.g., full name, social security number, date of birth, etc.);

c. Identify who made the non-permitted access, use or disclosure and who received the non-permitted disclosure;

d. Identify what corrective action Business Associate took or will take to prevent further non-permitted access, uses or disclosures;

e. Identify what Business Associate did or will do to mitigate any deleterious effect of the non-permitted access, use or disclosure; and

f. Provide such other information, including a written report, as Covered Entity may reasonably request.

(e) to ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by Business Associate on behalf of, Covered Entity agrees to the same restrictions and conditions that apply through this Addendum to Business Associate with respect to such information.

(f) to provide access, at the request of Covered Entity and in the time and manner designated by Covered Entity, to PHI in a Designated Record Set to Covered Entity in order to meet the requirements under 45 CFR § 164.524.

(g) to make any amendment(s) to PHI in a Designated Record Set that Covered Entity directs or agrees to pursuant to 45 CFR § 164.526 at the request of Covered Entity or an Individual, and in the time and manner designated by Covered Entity.

(h) to make internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Business Associate on behalf of, Covered Entity available to the Secretary of the Department of Health and Human Services, in a time and manner designated by the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

(i) to document such disclosures of PHI and information related to such disclosures as would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 CFR § 164.528.

(j) upon prior written request, make available during normal business hours at Business Associate's offices all records, books, agreements, policies and procedures relating to the use and/or disclosure of PHI to Covered Entity for purposes of enabling Covered Entity to determine the Business Associate's compliance with the terms of this Addendum.

(k) to disclose to its subcontractors, agents or other third parties, and request from Covered Entity, only the minimum PHI necessary to perform or fulfill a specific function required or permitted hereunder.

2.2 Responsibilities of Covered Entity. With regard to the use and/or disclosure of PHI by the Business Associate, Covered Entity hereby agrees:

(a) to inform the Business Associate of any material changes in the form of notice of privacy practices (the "Notice") that Covered Entity provides to individuals pursuant to 45 C.F.R. §164.520, where such changes require redistribution under HIPAA, and provide the Business Associate a copy of the Notice currently in use.

(b) to provide Business Associate with any changes in, or revocation of, permission by Individual to use or disclose PHI, if such changes affect Business Associate's permitted or required uses and disclosures.

(c) to inform the Business Associate of any opt-ins exercised by any individual from marketing activities of Covered Entity pursuant to 45 C.F.R. § 164.514(e).

(d) Business Associate shall not directly or indirectly receive remuneration in exchange for PHI. Nor shall Business Associate receive payment directly or indirectly for any use or disclosure of PHI for marketing purposes.

(e) to notify the Business Associate, in writing and in a timely manner, of any arrangements permitted or required of Covered Entity under 45 C.F.R. part 160 and 164 that may impact in any manner the use and/or disclosure of PHI by the Business Associate under this Addendum, including, but not limited to, restrictions on use and/or disclosure of PHI as provided for in 45 C.F.R. § 164.522 agreed to by Covered Entity.

(f) that Business Associate may make any use and/or disclosure of PHI permitted under 45 C.F.R. § 164.512 except uses or disclosure for research are not permitted without prior approval by Covered Entity.

## 3. TERM AND TERMINATION

3.1 Term. This Addendum shall become effective on the Effective Date and shall continue in effect until all obligations of the Parties under the Network Access Agreement have been met, unless terminated as provided in this Section 3. In addition, certain provisions and requirements of this Addendum shall survive the expiration or other termination of the Network Access Agreement.

3.2 Termination by Covered Entity. As provided for under 45 C.F.R. § 164.504(e)(2)(iii), Covered Entity may immediately terminate this Addendum if Covered Entity makes the determination that the Business Associate has breached a material term of this Addendum and Business Associate either fails to cure the breach or a cure is not possible. Covered Entity shall: (i) provide the Business Associate with written notice of the existence of an alleged material breach; and (ii) afford the Business Associate an opportunity to cure said alleged material breach upon mutually agreeable terms. Nonetheless, in the event that mutually agreeable terms cannot be achieved within five (5) days of receipt of the written notice, Business Associate must cure said breach to the satisfaction of Covered Entity within thirty (30) days. Failure to cure in the manner set forth in this paragraph is grounds for the immediate termination of this Addendum.

3.3 Effect of Termination. Upon the event of termination pursuant to this Section 3 or Section 4.4 of this Addendum, Business Associate agrees to return or destroy all PHI pursuant to 45 C.F.R. § 164.504(e)(2)(I) if it is feasible to do so. Prior to doing so, the Business Associate further agrees to recover any PHI in the possession of its subcontractors or agents. If it is not feasible for the Business Associate to return or destroy said PHI, the Business Associate will notify Covered Entity in writing. Said notification shall include: (i) a statement that the Business Associate has determined that it is infeasible to return or destroy the PHI in its possession, and (ii) the specific reasons for such determination. Business Associate further agrees to extend any and all protections, limitations and restrictions contained in this Addendum to the Business Associate's use and/or disclosure of any PHI retained after the termination of this Addendum, and to limit any further uses

and/or disclosures to the purposes that make the return or destruction of the PHI infeasible. If it is infeasible for the Business Associate to obtain, from a subcontractor or agent any PHI in the possession of the subcontractor or agent, the Business Associate must provide a written explanation to Covered Entity and require the subcontractors and agents to agree to extend any and all protections, limitations and restrictions contained in this Addendum to the subcontractors' and/or agents' use and/or disclosure of any PHI retained after the termination of this Addendum, and to limit any further uses and/or disclosures to the purposes that make the return or destruction of the PHI infeasible.

## 4. MISCELLANEOUS

4.1 Business Associate. For purposes of this Addendum, Business Associate shall mean UCCI when it creates, receives, maintains, transmits or destroys PHI on behalf of SOLSTICE and when UCCI acts in the capacity of business associate as defined by HIPAA. However, in the event that the Business Associate is otherwise a covered entity under the Privacy Regulation, that entity may appropriately designate a health care component of the entity, pursuant to 45 C.F.R. § 164.105, as the Business Associate for purposes of this Addendum.

4.2 Covered Entity**.** For purposes of this Addendum, Covered Entity shall mean SOLSTICE when the Addendum refers to PHI that is created by SOLSTICE.

4.3 Regulatory References. A reference in this Addendum to a section in the Privacy Rule means the section as in effect or as amended, and for which compliance is required.

4.4 Amendment. The Parties acknowledge that state and federal laws relating to the security and privacy of PHI are rapidly evolving and that modification of this Addendum may be required to provide for procedures to ensure compliance with such developments. The Parties specifically agree to take such action as is necessary to implement the standards and requirements of the Privacy Rule and the Security Rule. Upon request of either Party, the other Party agrees to promptly enter into negotiations concerning the terms of a modification to this Addendum embodying written assurances consistent with the standards and requirements of the Privacy Rule and the Security Rule. Covered Entity may terminate this Addendum upon thirty (30) days written notice in the event: 1.Business Associate does not promptly enter into negotiations to modify this Agreement when requested by Covered Entity under this Section 4; or 2. Business Associate does not enter into a modification of this Agreement providing assurances regarding the safeguarding of PHI that Covered Entity, in its sole discretion, deems sufficient to satisfy the standards and the requirements of the Privacy Rule and the Security Rule.

4.5 Survival. The respective rights and obligations of Business Associate and Covered Entity under Sections 3 and 4 of this Addendum shall survive the termination of this Addendum.

4.6 Interpretation. Any ambiguity in this Addendum shall be resolved in favor of a meaning that permits Covered Entity to comply with the Privacy Rule and the Security Rule.

4.7 Security Rule. Any PHI that is transmitted via electronic media or maintained in electronic media by Business Associate will be protected under standards and specifications no less stringent than those described in the Security Rule.

4.8 Relationship of Parties. None of the provisions of this Agreement are intended to create or shall be deemed to create any relationship between the Parties other than that of independent parties contracting with each other solely for the purposes of effecting the provisions of this Agreement and any other Arrangement between the Parties.

4.9 Ownership of PHI. The PHI and any related information created for or received from Covered Entity is, and will remain, the property of Covered Entity. Business Associate agrees that it acquires no ownership rights to or title in the PHI or any related information.

## 5. DEFINITIONS.

**ALL CAPITALIZED TERMS USED IN THIS ADDENDUM AND NOT OTHERWISE DEFINED HEREIN, SHALL HAVE THE SAME MEANING AS SET FORTH UNDER THE PRIVACY RULE AND THE SECURITY RULE.**

5.1 Designated Record Set. "Designated Record Set" shall have the meaning set out in its definition at 45 C.F.R. § 164.501, as such provision is currently drafted and as it is subsequently updated, amended, or revised.

5.2 Individual. "Individual" shall have the same meaning as the term "individual" in 45 CFR § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 CFR § 164.502(g).

5.3 Privacy Officer. "Privacy Officer" shall have the meaning as set out in its definition at 45 C.F.R. § 164.530(a)(1) as such provision is currently drafted and as it is subsequently updated, amended or revised.

5.4 Privacy Rule. "Privacy Rule" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A and E.

5.5 Protected Health Information. "PHI" shall have the meaning as set out in its definition at 45 C.F.R. § 160.103, as such provision is currently drafted and as it is subsequently updated, amended or revised.

5.6 Required By Law. "Required By Law" shall have the same meaning as the term "required by law" in 45 CFR § 164.103.

5.7 Secretary. "Secretary" shall mean the Secretary of the Department of Health and Human Services or his designee.

5.8 Security Incident as defined in 45 CFR 164.304 means successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system.

5.9 Security Rule means the Security Standards at 45 C.F.R. Parts 160 and 164, Subparts A and C.

5.10 Breach is defined in HITECH, Section 13400(1) as the unauthorized acquisition, access, use, or disclosure of protected health information which compromises the security or privacy of such information, except where an unauthorized person to whom such information is disclosed would not reasonably have been able to retain such information. Breach does not include the following:

1. Any unintentional acquisition, access or use of protected health information by an employee or individual acting under the authority of a covered entity or business associate if –

a. such acquisition, access, or use was made in good faith and within the course and scope of the employment or other professional relationship of such employee or individual and

b. such information is not further acquired, accessed, used or disclosed by any person; or

2. Any inadvertent disclosure from an individual who is otherwise authorized to access protected health information at a facility operated by a covered entity or business associate to another similarly situated individual at same facility; and

3. Any such information received as a result of such disclosure is not further acquired, accessed, used or disclosed without authorization by any person.